**SAN FRANCISCO LOCAL JOINT EXECUTIVE BOARD OF CULINARY WORKERS et al., Petitioners,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent (two cases).**

**SAN FRANCISCO LOCAL JOINT EXECUTIVE BOARD OF CULINARY WORKERS et al., Petitioners,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**McDonald's System of California, Inc., Intervenor.**

**Nos. 73-1489, 73-1579 and 73-1605.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1974.

Decided June 21, 1974.

David Nevins, Washington, D. C., of the bar of the Supreme Court of Minnesota, pro hac vice, by special leave of court, for petitioners. Barry S. Jellison

and David J. Salniker were on the brief for petitioners.

Robert A. Giannasi, Atty., NLRB, with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, NLRB, were on the brief, for respondent.

Wesley J. Fastiff, San Francisco, Cal., with whom Robert M. Lieber, Washington, D. C., was on the brief, for intervenor in No. 73-1605.

Before WRIGHT and MacKINNON, Circuit Judges, and DAVIES,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

The petitioner union requests review of three orders issued against it by the National Labor Relations Board. Though each of these orders was based upon findings that the union had picketed *specific* employers in violation of Section 8(b)(7) of the National Labor Relations Act, 29 U.S.C. § 158(b)(7) (1970), the orders were framed broadly to restrain the union from picketing *any* employer in violation of Section 8(b)(7). We hold that in each case the NLRB's findings of union violations of the Act were supported by substantial evidence considered on the record as a whole,[1] but that the orders cannot be enforced so broadly framed. We shall discuss the evidence supporting the Board's unfair labor practice findings in the three cases before turning to the broad order issue common to all the cases.

## I. NO. 73-1489

In this case the Board found the union to have violated Section 8(b)(7)(B) of the Act by picketing the two employer members of the Associated Union Street Restaurants for the purpose of obtaining recognition as the collective bargaining agent of the employees of these employers within 12 months of a valid Board representational election.[2] The union concedes that it picketed the employers with a recognitional objective and that it continued to do so shortly after the Board conducted an election in which another labor organization failed to obtain representational status. However, it contends that the NLRB's election was not, as required by the terms of Section 8(b)(7)(B), a valid one. The union's position rests on two theories, both of which the Board had sufficient evidence to reject.

First, the union argues that by processing the election the NLRB transgressed one of its self-imposed jurisdictional limitations. Though Congress has vested in the Board "the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause," NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (emphasis in original), the Board long ago recognized that the limited amounts of money appropriated to it to administer the Act required it to adopt minimum jurisdictional standards.[3] Under one of these standards, the Board will not assert jurisdiction over the labor relations of a retail

* Of the United States District Court for the District of North Dakota, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. 29 U.S.C. § 160(e) (1970); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-488 (1951).

2. Section 8(b)(7)(B) states in pertinent part:

(b) It shall be an unfair labor practice for labor organization or its agents—

* * * * *

(7) to picket or cause to be picketed * * * any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, * * * unless such labor organization is currently certified as the representative of such employees:

* * * * *

(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted * * *.

3. *See* M. Forkosch, A Treatise on Labor Law § 296 at 538 (2d ed. 1965).

enterprise unless it has annual gross revenues of at least $500,000. *E. g.*, Carolina Supplies & Cement Co., 122 NLRB 88, 89 (1958). Neither of the picketed restaurants individually has gross revenues of this size. However, the Board has long held that where a multi-employer bargaining unit is appropriate, the economic impact of the employers is to be combined for purposes of determining whether the jurisdictional standards are met. *See* NLRB v. Sightseeing Guides & Lecturers Union Local 20076, 2 Cir., 310 F.2d 40, 42 (1962). Here the trial examiner, and the Board by adopting his report, determined that a bargaining unit combining the employees of the two picketed restaurants was appropriate because the restaurants had incorporated an association to which they had mutually and unequivocally committed their collective bargaining and because the only labor organization which had provided any evidence of employee support had agreed to a multi-employer unit.

The Board's acceptance of the appropriateness of a multi-employer unit, and thus its assertion of jurisdiction, was both within its statutory discretion and consistent with its past exercise of that discretion. The Board has been vested by Section 9(b) of the Act with "a broad discretion to determine appropriate units." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). This discretion has been employed with judicial approval to recognize multi-employer units where there is either " 'a controlling history of collective bargaining on such basis, or *an unequivocal agreement* of the parties to bind themselves to a course of group bargaining in the future.' " NLRB v. Johnson Sheet Metal, Inc., 10 Cir., 442 F.2d 1056, 1060 (1971) (emphasis in original), *quoting* Electric Theatre, 156 NLRB 1351, 1352 (1966).

The trial examiner's decision adopted by the Board found such an unequivocal agreement in the instant case to be evidenced by the bylaws of the association the employers created to perform their collective bargaining jointly. By one of the articles of the bylaws the employers authorize the association to be their "exclusive representative in collective bargaining."[4] The union stresses that the bylaws also effectively permit either employer to reject any agreement negotiated by the association.[5] However, the Board has declined, quite reasonably we think, to rule that employers in a multi-employer unit must agree in advance to accept every jointly bargained agreement as long as the employers did not retain the freedom to bargain individually and sign individual contracts. *E. g.*, Air Conditioning Co. of Southern California, 81 NLRB 946, 951 (1949). The union argues that bylaws provisions prescribing the manner and the amount of notice for resignation from the association also render inappropriate the multi-employer unit. But the Board has regularly permitted employers to withdraw from multi-employer units at appropriate times, not including periods of substantive bargaining, even in the absence of prior withdrawal agreements. *See, e. g.*, Sullivan Mining Co., 101 NLRB 1366, 1369 (1952); Milk & Ice Cream Dealers of Greater Cincinnati Area, 94 NLRB 23, 25 (1951). There was, of course, no provision in the multi-employer bargaining agreement here which permitted withdrawal during substantive bargaining. Thus the Board was correct in holding that the provision for resignation from the multi-employer unit does not negate the employers' intent and commitment to bargain jointly expressed in the bylaws.

The union's second basis for arguing that the Board election was invalid is even less firm than its challenge to the Board's jurisdiction. The union

4. Article XVII, Joint Appendix Vol. 2 at 20.

5. Article VIII, JA Vol. 2 at 15, allows any employer of more than a third of the covered employees to veto an agreement reached by the association's negotiating committee. The association at present has only two members of roughly equivalent size.

contends that it should have been permitted to intervene in the representation proceeding and election precipitated by another union. The Board's denial of intervention, however, was in complete accord with reasonable and established Board practice. The Union Street Organizing Committee, a labor organization completely separate from petitioner here, petitioned the Board for a representation election, making the requisite showing of support from more than 30 per cent of the employees of the two restaurants. *See* NLRB Rules and Regulations 101.18, 29 C.F.R. § 101.18 (1973). The Organizing Committee and the employer association then agreed to a consent election. Though Section 9(c)(1) of the Act, 29 U.S.C. § 159(c)(1) (1970), provides for pre-election Board hearings, waiver of such a hearing as stipulated by the parties in this case is expressly endorsed by Section 9(c)(4). Under Board procedures another union may intervene, block a consent election, and participate fully in any representation proceeding upon a showing that it has the support of as few as 10 per cent of the employees in a unit claimed to be appropriate. NLRB Field Manual 11022.3(c) (1968); Corn Products Refining Co., 87 NLRB 187 n. 2, 192 n. 14 (1949). In addition, another union may be included on the ballot upon designation of support from as few as one or two employees. NLRB Field Manual 11022.3(d); Fostoria, Ohio, Works of National Carbon Div., Union Carbide & Carbon Corp., 89 NLRB 460 (1950). In this case petitioner was notified by telegram of the proceedings and asked to demonstrate its support. Since this telegram and another request a week later failed to move petitioner to make any showing whatever, we think the Board was justified in following its procedures to deny petitioner intervention, including a place on the ballot.[6]

## II. NOS 73-1579 AND 73-1605

■ These cases arise under another clause of the recognitional picketing provision of the Act, Section 8(b)(7). In both cases the NLRB held that the union violated Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C), by engaging in recognitional picketing for more than 30 days without filing a representation petition before the Board.[7] The union challenges the NLRB's decision in these two cases on two grounds. First, the union denies that the picketing was engaged in for a recognitional purpose. Second, it contends that, even if recognitional, the picketing was lawful under the second proviso of Section 8(b)(7)(C). That proviso states:

> That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

6. The continued picketing of the Union Street restaurants surely did not constitute a showing of minimal employee support. That picketing could have been performed completely by non-employees; the union did not present any evidence of employee support for the picketing.

7. Section 8(b)(7)(C) provides in pertinent part:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> * * * * *
>
> (7) to picket or cause to be picketed * * * any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, * * * unless such labor organization is currently certified as the representative of such employees:
>
> * * * * *
>
> (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing * * *.

29 U.S.C. § 158(b)(7)(C). We find that the NLRB had substantial evidence before it in each case to reject, as it did, both union arguments.

The union argues that the purpose of its challenged picketing was not recognitional but was to persuade the respective restaurant employers in each case, Jack-in-the-Box in No. 73–1579 and McDonald's in No. 73–1605, to raise their working conditions to those which are standard for comparable establishments in the San Francisco area. The union is correct in asserting that picketing for such a purpose is not equivalent to recognitional picketing and therefore is not regulated by Section 8(b)(7). *See, e. g.*, Houston Building & Construction Trades Council, 136 NLRB 321, 323 (1962).[8] However, in both 73–1579 and 73–1605 the NLRB was warranted in finding that the union's purpose was at least in part to obtain recognition.[9]

The placards carried around both Jack-in-the-Box and McDonald's bore the legend:

NON-UNION CONDITIONS
SAN FRANCISCO JOINT EXECUTIVE BOARD OF CULINARY WORKERS, BARTENDERS AND HOTEL, MOTEL AND CLUB SERVICE WORKERS

Though this legend could be interpreted as merely a protest of the restaurant's working conditions,[10] it was reasonable for the NLRB to conclude that the message communicated to all who witnessed the picketing was at least in part that the union desired to alter a non-union working situation by obtaining recognition. In the absence of any countervailing evidence, the NLRB could thus determine that the purpose of the picketing was recognitional.[11] The union offered no such countervailing evidence in either case.[12] It did not allege that the

8. It is clear from its structuring that § 8(b)(7) only regulates picketing with "an object" of "forcing or requiring an employer to recognize or bargain with a labor organization." 29 U.S.C. § 158(b)(7). If the object of picketing is not recognitional, it is not regulated by the Act even if completely directed toward signaling other workingmen to coerce the picketed employer. *See* Houston Building & Construction Trades Council. 136 NLRB 321, 323–324 (1962).

9. Section 8(b)(7) regulates picketing which has "*an* object" of obtaining recognition. 29 U.S.C. § 158(b)(7) (emphasis added). Therefore, for picketing to be beyond the scope of § 8(b)(7), the union must not combine the objective of protecting area working standards with a recognitional goal. *See* Samoff v. Highway Truck Drivers & Helpers, Local 107, E.D.Pa., 355 F.Supp. 505, 509 (1973).

10. The legends were apparently carefully fashioned to avoid previous Board holdings which found signs announcing that the employer was operating without a union to evidence a recognitional objective. *See, e. g.*, Carpenters Local No. 2133, 151 NLRB 1378, 1380 (1965), enforced, 9 Cir., 356 F.2d 464 (1968) ("Doing this work NON-UNION"). *See* note 11 *infra*.

11. * * * The danger in distinguishing picketing to protest substandard wages or working conditions from picketing for union recognition or organization is that it may encourage verbal evasions through disingenuous phrasing of the pickets' placards and the union's demands. The best solution would be to treat the union's objective as a question of fact. Normally recognition or union organization are objectives of any picketing of an unorganized shop, but the force of this presumption, based upon experience, can be dissipated by proof that the labor conditions of which the union complains are presently such a substantial threat to existing union standards in other shops as to support a finding that the union has a genuine interest in compelling the improvement of the labor conditions or eliminating the competition, even though the union does not become the bargaining representative.

Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L. Rev. 257, 267 (1959).

12. In some circumstances at least it is proper for the Board to draw inferences from the failure of a party to come forward with evidence which if it existed would benefit that party's position. NLRB v. A.P.W. Products Co., 2 Cir., 316 F.2d 899, 903 (1963). *See also* NLRB v. Ship Shape Maintenance Co., 154 U.S.App.D.C. 186, 192, 474 F.2d 434, 440 (1972); Int. U., United Automobile, etc. Wkrs v. NLRB, 148 U.S. App.D.C. 305, 459 F.2d 1329 (1972). This does not, contrary to the union's assertion,

restaurants had been apprised that the picketing would be stopped if the working conditions were improved. Indeed, no showing was made that before commencing to picket the union even informed itself as to how the wages and working conditions of Jack-in-the-Box and McDonald's employees compared with those of employees at restaurants of similar quality in the general area.[13] The only additional evidence on the record before the NLRB in each case supported the recognitional inference which it drew from the picket signs. In No. 73–1579 it was stipulated by the union that two pickets at different times had told a Jack-in-the-Box attorney that they were attempting to gain union recognition. The record in No. 73–1605 reveals that during the condemned picketing of McDonald's the union secretary, Joseph Belardi, stated before the San Francisco Board of Permit Appeals that he had without success asked McDonald's on several occasions to negotiate with the union as the representative of its San Francisco employees.

The Board also had substantial evidence on which to base its conclusion in each case that the union's picketing was not protected by the informational picketing proviso in Section 8(b)(7)(C). The purpose of this proviso is to protect picketing which attempts to achieve union recognition, not by signaling employees of other employers to inconvenience and coerce the picketed employer, but rather by informing the general public of the employer's refusal to deal with a union.[14] However, recognitional picketing, even when *intended* merely to so inform the general public, is not protected when it has the *effect* of inducing the employees of other employers to stop deliveries or other services to the targeted employer in order to coerce him into recognizing the union. Assuming that the picketing of Jack-in-the-Box and McDonald's was engaged in by the union to inform the general public, there clearly was substantial evidence in both cases for the Board to conclude that the picketing was not protected by the second proviso of Section 8(b)(7)(C) because of its coercive effect. The union stipulated in both No. 73–1579 and No. 73–1605 that for several weeks, as a result of the picketing, employees of providers of numerous products, such as dairy goods and coffee, essential to the operation of the Jack-in-the-Box and McDonald's restaurants[15] refused to deliver these products at the picketed restaurants. While a number of isolated or sporadic instances of work stoppage or non-delivery should not prevent picketing

shift from the Board the burden of proof, but rather only the burden of going forward with particular evidence.

13. One court has stated:

> * * * Where evidence is presented that a union commenced "area standards" picketing prior to an investigation of the employer whose standards are being protested, a permissible inference may be drawn that the true objective is recognition or organization. * * *

Samoff v. Highway Truck Drivers & Helpers, Local 107, *supra* note 9, 355 F.Supp. at 509. *See also* Centralia Building & Construction Trades Council v. NLRB, 124 U.S. App.D.C. 212, 214, 363 F.2d 699, 701 (1966); NLRB v. United Brhd of Carpenters & Joiners, Local 745, 9 Cir., 450 F.2d 1255, 1257 (1971). In the presence of union officials at a hearing before the Board of Permit Appeals a McDonald's manager stated the average wage rate at their picketed restaurant. However, this hearing occurred more than two months after the picketing of the McDonald's in No. 73–1605 was initiated. In addition, there was no evidence in the record of how this average rate compares with the wage rate at similar unionized restaurants.

14. *See* NLRB v. Local 3, Int. Brhd of Electrical Wkrs, 2 Cir., 317 F.2d 193, 198–199 (1963).

15. The union stipulated that its picketing of Jack-in-the Box in No. 73–1579 caused deliveries of bread, dairy goods, and coffee to cease at the picketed establishment. JA at 10. In No. 73–1605 it was stipulated that as a result of the picketing of McDonald's suppliers of shake mix, dairy products, coffee, chocolate, jelly, honey, tomato juice, crew shirts, and cooking utensils eventually ceased delivering to the targeted restaurant. JA Vol. 2 at 39–40.

from being protected by the informational proviso, the evidence stipulated in these cases indicates regular non-deliveries over several-week periods which the union, while continuing to picket, made no effort to prevent.[16]

III. THE BROAD REMEDIAL ORDERS

Though we uphold the Board's findings in each of these cases that the union engaged in recognitional picketing violative of Section 8(b)(7) of the Act, we cannot enforce without modification the remedial orders entered by the Board in any of the cases. In No. 73–1489 the Board's order restrains the union from picketing not only any employer member of Associated Union Street Restaurants, but also "any other employer" for a recognitional object in violation of Section 8(b)(7)(B). Similarly, in Nos. 73–1579 and 73–1605 the Board's orders restrain the union from picketing not only Jack-in-the-Box and McDonald's, but also "any other employer" for a recognitional object in violation of Section 8(b)(7)(C). We narrow the Board's orders in all three cases by deleting references to "any other employer" so that they restrain the union from proscribed recognitional picketing only with respect to those employers the Board found the union to have unlawfully picketed.

Though the Board is not limited under Section 10(c) of the Act, 29 U.S.C. § 160(c), to a "rigid scheme of remedies" for unfair labor practices, Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), the authority conferred on the Board by Section 10(c) "is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct," NLRB v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941). *See also* May Department Stores Co. v. NLRB, 326 U.S. 376, 392–393, 66 S.Ct. 203, 90 L.Ed. 145 (1945). The Supreme Court has thus held that broad Board orders against a union protecting "any other employer" are only justified where there is evidence that the unlawful activity was part of a "generalized scheme" to violate the Act against all employers. Communications Workers v. NLRB, 362 U.S. 479, 480–481, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960). This court has followed the Supreme Court in disfavoring broad remedial orders such as those entered by the Board in instant cases. Local U. No. 519, United Ass'n of Journeymen, etc. of

16. *Compare* Barker Brothers Corp. v. NLRB, 9 Cir., 328 F.2d 431, 433 (1964); Retail Store Employees Union, Local 428, 141 NLRB 503, 504 (1963); Retail Clerks Union, Local 1404, 140 NLRB 1344, 1346 (1963).

The union stresses that the effect of the non-deliveries was merely to force Jack-in-the-Box and McDonald's to increase deliveries at the closest other restaurant in their respective chains and then to send some of their employees to pick up the necessary supplies at this other restaurant. The union argues that the delivery stoppage thus had no "substantial impact" on the two employers' operations. Though there is no evidence in the record indicating the existence and size of any financial pinch on the restaurants from having to change their operations in this fashion, we find that the plain words of the statute simply do not require a substantial economic impact. However, in order for informational picketing not to be protected, these words do require that the picketing cause a work stoppage by inducing an employee of another employer rather than the picketed employer to cease regular provision of the services. Clearly an employer subjected to informational picketing cannot avoid the second proviso to § 8(b)(7)(C) by asking other employers serving him to have their employees shut off service. The union should have an opportunity to demonstrate that the work stoppage was instigated by the picketed employer. Though not a sufficient demonstration in itself, the lack of any substantial economic impact on the employer is consistent with his instigation of a service change. In any case, the union made no suggestion before the Board that Jack-in-the-Box or McDonald's had initiated the stoppage of deliveries to the picketed stores.

Plumbing etc. Industry v. NLRB, 135 U.S.App.D.C. 105, 111, 416 F.2d 1120, 1126 (1969); Local No. 636, United Ass'n of Journeymen etc. of Plumbing etc. Industry v. NLRB, 108 U.S.App. D.C. 24, 31, 278 F.2d 858, 865 (1960); Int. Brhd of Teamsters etc. v. NLRB, 104 U.S.App.D.C. 359, 365, 262 F.2d 456, 462 (1958).[17]

In the absence of substantial evidence on the record in any of these cases that the proven unfair labor practices were part of a generalized scheme to violate the Act, we continue to disfavor these broad orders. With respect to the Associated Union Street Restaurants case, No. 73–1489, statements on the record that the union intended to attempt to organize all the restaurants along the new commercial section of Union Street and that they had been picketing many of these establishments certainly do not provide such evidence. Organizing a trade area is, of course, a legitimate union objective, *see* Int. Brhd of Teamsters, etc. v. NLRB, *supra,* 104 U.S.App.D.C. at 365, 262 F.2d at 462, and for all the record indicates the other restaurants, with one exception, may have been lawfully picketed. The one exception is The Coffee Cantata which the Board in another decision found had been picketed in violation of Section 8(b)(7)(B). San Francisco Local Joint Executive Board of Culinary Workers, 196 NLRB 633 (1972).

The trial examiner's decisions adopted by the Board in both No. 73–1579 and No. 73–1605 relied on the unappealed Coffee Cantata decision and the here appealed Associated Union Street Restaurants, No. 73–1489, decision in framing broad orders. We do not believe that two previous Board unfair labor practice findings against a union without more prove that it is engaged in a generalized scheme to violate the Act. The union here is a sizable labor organization in a major metropolitan area; when placed in the context of all its activities, these two violations, even when augmented by the violations found in Nos. 73–1579 and 73–1605, take on the coloration of isolated incidents in which the union, perhaps innocently misconstruing the Board's jurisdictional limitation principles, was somewhat overzealous in pursuing its legitimate organizational goals.

The Board's orders as herein modified are

Enforced.

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

I concur in the foregoing opinion except with respect to Part III, from which I respectfully dissent. In Part III the majority opinion modifies the Board's cease and desist orders by deletion of the phrase "any other employer," thus limiting the orders' restraining effect to unlawful picketing by the Union of only the employers involved in the cases at bar. This modification strikes at the heart of the considered judgment of the Board on an issue—appropriate rem-

17. Citing Int. Brhd of Electrical Wkrs v. NLRB, 341 U.S. 694, 705–706, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), the Board asserts that the Supreme Court has approved the practice of the Board's broadening a remedial order to protect other employers exposed to the same type of pressure. The Board's order in *Electrical Workers* was based on a finding that the union had unlawfully picketed certain employers in order to instigate a secondary boycott against a particular non-union employer. The order restrained the union from picketing any other employers for the purpose of instigating such a boycott against the non-union employer. The order thus only anticipated that the union might again conduct unlawful activities in attempting to organize the one employer whose non-union status had already provoked unfair labor practices. It did not anticipate, nor did it restrain the union from, violations of the Act directed against other employers. The Board similarly misplaces reliance on Local No. 5, United Ass'n of Journeymen etc. of Plumbing etc. Industry v. NLRB, 116 U.S.App.D.C. 100, 105–106, 321 F.2d 366, 371–372, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963), and Bakery Wagon Drivers & Salesmen, Local U. No. 484 v. NLRB, 116 U.S.App.D.C. 87, 92, 321 F.2d 353, 358 (1963), in arguing that this court has enforced orders as broad as those we review today.

edies for established unfair labor practices—in which the Board traditionally has been accorded the greatest deference.

The Board's findings, of course, must be sustained on appeal if supported by substantial evidence in the record considered as a whole. National Labor Relations Act § 10(e), 29 U.S.C. § 160(e) (1970); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951). Moreover, once it is established that the Board correctly has found the existence of unfair labor practices, its conscious selection of remedies designed to redress such violations and effectuate the policies of the Act is accorded great deference. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S. Ct. 287, 97 L.Ed. 377 (1953); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). After finding that a person has committed an unfair labor practice, Section 10(c) of the Act requires the Board to issue "an order requiring such person to cease and desist from such unfair labor practice"; "the proper scope of [such] a Board order . . . calls for ample discretion in adapting remedy to violation." NLRB v. Cheney Lumber Co., 327 U.S. 385, 388, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946).

Where a broad cease and desist order is at issue, however, a limiting principle becomes operative. That is, where the Board seeks court enforcement of a broad order prohibiting all violations of the Act or one applying to all employers covered by the Act, it should be subjected to more rigorous scrutiny. This limiting principle derives essentially from two sources: First, appellate courts were never intended to sit as labor courts of first instance, trying unfair labor practices without an initial adjudication by the Board. Second, a heightened sense of responsibility is demanded to guard against an unwarranted invocation of our contempt powers in a future case dissimilar to that which caused this court to lend its injunctive aid to the Board in the first instance. For example, in NLRB v. Express Publishing Co., 312 U.S. 426, 430, 61 S.Ct. 693, 697, 85 L.Ed. 930 (1941), the Court struck that part of a Board order that "ordered broadly that [the employer] should in effect refrain from violating the Act in any manner whatsoever." The Court reasoned that

> it does not follow that, because the act of respondent which the Board has found to be an unfair labor practice defined by § 8(5) is also a technical violation of § 8(1), the Board, in the circumstances of this case, is justified in making a blanket order restraining the employer from committing any act in violation of the statute, however unrelated it may be to those charged and found, or that courts are required for the indefinite future to give effect in contempt proceedings to an order of such breadth.
>
> * * * * * *
>
> It is obvious that the order of the Board, which when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing.
>
> * * * * * *
>
> [W]e think that Congress did not contemplate that the courts should, by contempt proceedings, try alleged violations of the National Labor Relations Act not in controversy and not found by the Board and which are not similar or fairly related to the unfair labor practice which the Board has found.

*Id.* at 433–435. *Express Publishing,* then, recognized certain constraints upon the exercise of the judicial enforcement power, constraints made necessary by the problems implicit in the intermeshing of the inherent equity powers of the courts with the statutory right of the Board to seek judicial enforcement of its remedial orders.

However, as *Express Publishing* also recognized, even though a "court should

[not] enforce orders which could not appropriately be made in judicial proceedings * * * [a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Id.* at 435. The Board possesses the same broad power as the federal courts in determining the scope of cease and desist orders necessary to prevent violations of the Act fairly anticipatable from past conduct. May Dep't Stores v. NLRB, 326 U.S. 376, 391–392, 66 S.Ct. 203, 90 L.Ed. 145 (1945). *Express Publishing* was relied on in Communications Workers v. NLRB, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960), where the Court deleted the phrase "any other employer" from an order which prohibited future violations of Section 8(b)(1)(A) of the Act. There, however, the unions "were not found to have engaged in violations against the employees of any employer other than" the single employer involved in that case. *Id.* at 480. Thus the Court was unable to find any evidence of a "generalized scheme" against other employers. This "generalized scheme" label is given meaningful content by an examination of the purpose of the broad cease and desist order, which is "to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed . . . in the past." NLRB v. Express Publishing Co., *supra,* 312 U.S. at 436–437.[1]

The majority purports to be following "the Supreme Court in disfavoring broad remedial orders such as those entered by the Board in the instant cases." Majority Op. at 801. The majority opinion, however, points to no Supreme Court cases even remotely factually similar to the cases at bar. As discussed above, *Communications Workers* involved a union that had committed an unfair labor practice against only one employer and there was no evidence that suggested any proclivity by the union similarly to violate the Act against other employers. *May Dep't Stores* and *Express Publishing* both involved a type of broad order not at issue in this case, that is, one that generally prohibited any action by the employers in those cases that would in any way infringe their employees' rights guaranteed under Section 7.

Indeed, our own cases lend no support to the majority position. Local Union No. 519, United Ass'n of Journeymen, etc. v. NLRB, 135 U.S.App.D.C. 105, 416 F.2d 1120 (1969), and Local No. 636, United Ass'n of Journeymen, etc. v. NLRB, 108 U.S.App.D.C. 24, 278 F.2d 858 (1960), each involved only the single employer that was a party to the case and there was no other relevant evidence tending to demonstrate the prerequisite "generalized scheme" or proclivity to violate the Act. It should also be noted that International Brotherhood of Teamsters, etc., Local No. 554 v. NLRB, 104 U.S.App.D.C. 359, 262 F.2d 456 (1958), antedated by two years the Supreme Court's decision in *Communications Workers,* which indicated that a broad order is permissible where a "gen-

1. *Express Publishing* and *Communications Workers* involved analytically discrete but pragmatically closely related problems. *Express Publishing* concerned the requirement of similarity in the *type* of unfair labor practice prohibited, holding that a broad prohibition against any violation of the entire Act was unjustified where the likelihood of future violations of sections other than that before the Court was not indicated by past conduct. *Communications Workers,* on the other hand, examined whether the past conduct of the union indicated that it would be likely to proceed illegally against employers other than the single employer involved in that case. Both cases, however, focused on foreseeability of future violations by analysis of past illegal conduct. Although necessarily premised in the first instance on a mechanical examination of the type and number of past violations, resolution of this issue finally and best resides, as do most such problematic determinations, in the informed and considered judgment of the Board.

eralized scheme" to violate the Act is found. Moreover, *Teamsters* involved illegal secondary activity against only two employers and is thus factually distinguishable from the instant case, which presents far stronger evidence of a proclivity to indulge in illegal picketing. As noted in NLRB v. Local 282, International Brotherhood of Teamsters, etc., 428 F.2d 994, 999 (2d Cir. 1970) (citations omitted), which found a union in contempt of an enforced broad order: [2]

> In those cases where injunctions have been found overbroad, it has been held that there was no evidence that the enjoined party had proceeded in the past or would proceed in the future to violate any labor rights other than those of the particular parties named in the decree.

In this case, we are presented with a union that has violated the commands of the Act on four separate occasions, each violation constituting unlawful picketing for a recognitional object. This pattern of illegal picketing clearly satisfies *Express Publishing's* requirement that the prohibited acts be similar, since the Union has violated the same section on each occasion. The repeated illegal picketing against four different employers also satisfies *Communications Workers'* requirement of a "generalized scheme" to violate the Act. Amalgamated Local Union 355 v. NLRB, 481 F.2d 996, 1008 (2d Cir. 1973); NLRB v. Locals 138, 138A, 138B, International Union of Operating Engineers, AFL–CIO, 377 F.2d 528 (2d Cir. 1967); Truck Drivers & Helpers Local Union No. 728 v. NLRB, 332 F.2d 693 (5th Cir.), cert. denied, 379 U.S. 913, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964).[3] And it will not do to excuse the Union, as does the majority, as merely being "somewhat overzealous," Majority Op. at 802, for the established and persistent violations before the court today evidence that proclivity to violate the Act necessary to sustain the broad cease and desist orders involved here.

In rejecting this evidence the majority decision makes an illusion of the substantial evidence rule, disregarding the Supreme Court's dictate that the courts, when their enforcement of a broad order is requested, only "may examine its scope to see whether on the evidence they go so beyond the authority of the Board as to require modification as a *matter of law* before enforcement." May Dep't Stores Co. v. NLRB, *supra,* 326 U.S. at 392 (emphasis added). Responsible judicial review of remedial orders designed to effectuate the policies of the Act demands that this court respect the informed judgment of the Board when supported by substantial evidence, as is the case here. Such deference to the peculiar expertise of the Board evidences no abdication of judicial responsibility; rather, it constitutes an essential element of that responsibility, for the Courts of Appeals, far removed from the day to day rigors of labor relations, have no basis for presuming that their judgment in these matters is any better than the Board's.

I would, therefore, enforce the Board's orders without modification.

2. The court inadvertently imposed criminal rather than civil sanctions for the contempt and thus subsequently vacated the order imposing criminal sanctions and referred the case back to a special master for recommendations as to the appropriate sanctions. NLRB v. Local 282, International Brotherhood of Teamsters, etc., 438 F.2d 100 (2d Cir. 1970).

3. *Operating Engineers* and *Truck Drivers,* while involving secondary boycotts, do not fall within the fairly persuasive distinction drawn by the majority opinion in note 17. That distinction posits that in secondary boycott cases the Board legitimately may prohibit union pressure against all secondary employers where the object of such pressure is directed ultimately against the same primary employer involved in the original dispute with the union. *Operating Engineers* and *Truck Drivers,* however, broadly proscribed all secondary boycott activity by the respective unions ultimately directed against not only the original primary employer but also any other primary employers.