### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 265, Respondent.

### No. 78–1662.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 14, 1979.

Decided Aug. 20, 1979.

---

Andrew F. Tranovich, Atty., N. L. R. B., Washington, D. C., for petitioner; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Sandra Shands Elligers, Atty., Washington, D. C., on brief.

David D. Weinberg, of Weinberg & Weinberg, Omaha, Neb., for respondent.

Before HEANEY and McMILLIAN, Circuit Judges, and BENSON,* Chief Judge.

McMILLIAN, Circuit Judge.

The National Labor Relations Board [Board] petitions this court, pursuant to § 10(e) of the National Labor Relations Act [Act], as amended, 29 U.S.C. § 151 et seq., for enforcement of its order finding that the International Brotherhood of Electrical Workers, Local 265 [the Union], violated § 8(b)(7)(C) of the Act by unlawfully picketing for recognitional and organizational purposes.

The Board concluded that the Union violated § 8(b)(7)(C) by picketing R P & M Electric [the Company], an electrical contractor in the construction industry, with an object of forcing or requiring the Company to recognize or bargain with the Union when the Union was not the certified bargaining representative of the Company's employees and had not filed an election petition within thirty days after commencement of the picketing. We grant enforcement of the Board's order.

The facts as found by the Board are not in dispute. Briefly, they are as follows: In August, 1974, Arlie Heald, the Union's business manager, asked R P & M's president, Roger Trautwein, if he would sign a collective-bargaining agreement. Trautwein indicated that at an unspecified time in the future he would be amenable to such an agreement. About a month later, Heald asked Trautwein whether he was now ready and Trautwein said no. In July, 1976, Heald spoke with Bruce Trautwein (Roger's brother and a member of the Union) regarding the matter. Heald sent Bruce Trautwein to his brother to see if Roger Trautwein was now willing to sign. Bruce Trautwein reported back that Roger Trautwein was not interested.

Thereafter, on August 9, 1976, Heald sent the following letter to R P & M:

Gentlemen:

Your company has been and is engaged in electrical construction work in Lincoln,

* The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

and we note that you apparently have the electrical work for some of the Safeway Stores in Lincoln. This organization has investigated the conditions under which your employees perform their work. We have found that your total labor cost on the above work is below that which has been negotiated with contractors in the area. In addition, we have found that you are free to underbid fair contractors on work of this sort because of the substandard wages and benefits that you pay on other work.

As a matter of simple economics, therefore, the conditions under which your employees perform their work adversely affect other employees and limit employment opportunities for workers who regularly receive fair wages and benefits.

We wish to inform you that this organization does not intend to interfere with the rights of your employees to work without becoming members of the Union, nor does it make any demand upon you to sign a contract with our Union.

The purpose of this communication is to *request your company to pay your employees* who will be employed by you in Local 265's area performing work in the electrical field, the *minimum standards of wages, hours and working conditions* established by our Union. Our sole and only interest in this request is to *maintain minimum standards of wages, hours and working conditions* for electrical employees who will be employed by you in this area regardless of their Union or non-union affiliation. We want this specifically understood by your Company.

Our only object throughout the course of this dispute is to inform the public and the citizens in this area that your employees work under substandard conditions. We shall do so by means of peaceful primary picketing and other lawful forms of publicity at job sites and other locations where you are engaged in your normal business.

If you are desirous of complying with our request, *we will furnish your company with a statement of minimum standards of wages, hours and working condi-*

*tions* that have been established by our union for electricians. However, *if you request such a statement from us and in the event we can not reach a mutual agreement* relative to the union's request within a period of three days following receipt of this letter, our union and your company will be in dispute concerning *minimum standards established by our organization as to wages, hours and working conditions* for workmen who will be employed by you doing electrical work in this area.

On the other hand, if you do not contact us at all within the period of three days after receipt of this letter in answer to our request, our union and your company will be in dispute concerning minimum standards established by our organization as to wages, hours and working conditions for workmen who will be employed by you doing electrical work in this area.

We are *ready, willing and able to meet with your company* at a reasonable and convenient time, within the time limits expressed above for the purpose of discussion concerning the matters contained in this letter. (Emphasis supplied.)

By letter dated August 11, Roger Trautwein advised the Union that the work on the Safeway job had been completed. However, on two subsequent dates, October 11, 1976, and November 23–24, 1976, the Union picketed R P & M jobsites with a sign which read: "R P & M Elect. does not pay union wages & conditions. I.B.E.W. Local 265. This dispute with the above-named employer only." In each instance of picketing, the Union removed the picket after receiving a telegram from the general contractor on the project stating that R P & M had either been removed or would not be on the project during certain hours. Three carpenters and a laborer refused to cross the picket line on November 23.

It is also agreed that the Union never filed an election petition under § 9(c) of the Act, seeking certification by the Board as the bargaining representative of the Company's employees.

■ At the outset we are reminded of the very narrow standard of review in Board decisions. This court must affirm any Board decision to the extent that it rests on findings of fact for which there is substantial evidence in the record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir. 1978); *NLRB v. Wal-Mart Stores, Inc.*, 488 F.2d 114, 116–17 (8th Cir. 1973).

The Union contends that there is not substantial evidence in support of the Board's findings. The Union also contends that the attempts at attaining recognition by the Company of the Union had been abandoned prior to the sending of the August 9, 1976, letter. It argues that both the Administrative Law Judge [ALJ] and the Board presumed a continuation of a recognitional and an organizational objective because of the events that occurred in August, 1974. Granted, the August, 1974, attempts were well beyond the six-month period provided in § 10(b) of the Act, 29 U.S.C. § 160(b). This in no way detracts from the Board's finding that the Union's picketing had a recognitional object. In our view, the earlier events of August, 1974, while remote, at least shed some light upon the specific conduct beginning with Heald's conversation with Bruce Trautwein in July, 1976, Bruce's report back as to his brother Roger's position, and the subsequent August 9, 1976, letter. *See NLRB v. Carpenters Local 745*, 450 F.2d 1255, 1258 (9th Cir. 1971). In any event, neither the Board nor the ALJ purported to rest their decisions entirely upon the 1974 conduct, but instead rested upon their interpretation of the July, 1976, conversation and the subsequent August 9 letter for their finding of a § 8(b)(7)(C) violation.

The Union argues that the August 9, 1976, letter not only disavowed any interest in organizing the Company's employees or negotiating a contract on their behalf, but also was a mere "area standards" letter and thus had a nonorganizational purpose. In support of these arguments, the Union claims that the ALJ and the Board ignored Heald's uncontradicted testimony that the purpose of the letter was to attempt to maintain the hourly rates of wages and monetary benefits for Department of Labor purposes and that it was not the purpose of the Union to include all portions of the labor agreement in the request contained in the August 9 letter.

■ Section 8(b)(7), enacted as part of the 1959 Landrum-Griffin amendment to the Act, establishes a comprehensive code governing recognitional and organizational picketing. *NLRB v. Drivers Local 639 (Curtis Bros.)*, 362 U.S. 274, 291, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). The application of § 8(b)(7) is limited to picketing by unions, not currently certified, where an object thereof is either forcing or requiring an employer to recognize or bargain with it or forcing or requiring employees to select it as their bargaining representative. *Houston Building & Construction Trade Council, (Claude Everett Construction Co.)*, 136 NLRB 321, 49 LRRM 1757 (1962).

■ Congress enacted § 8(b)(7) as a corollary to the federal policy of ensuring employees a free choice in the selection of a bargaining representative. *Dayton Typographical Union No. 57 v. NLRB*, 117 U.S. App.D.C. 91, 94, 103–106, 326 F.2d 634, 637, 646–649 (D.C.Cir. 1963); *Local 542, Operating Engineers (R. S. Noonan, Inc.)*, 142 NLRB 1132, 53 LRRM 1205 (1963), enf'd, 331 F.2d 99, 107 (3d Cir.), *cert. denied*, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964). Prior to the 1959 amendments, a union could lawfully picket an employer for an unlimited length of time, either to compel the employer to recognize it as the bargaining representative of his employees or to force the employees to select it as their representative. Section 8(b)(7)(C) removes these threats by encouraging prompt resort to the Board's election process and by discouraging the economic pressures of picketing as the vehicle to resolve questions of representation. *Dayton Typographical Union No. 57 v. NLRB, supra*, 117 U.S.App. D.C. at 104, 326 F.2d at 647. *See also* Meltzer, *Organizational Picketing and the*

*NLRB: Five on a Seesaw*, 30 U.Chi.L.Rev. 78, 79–83 (1962). Consequently, § 8(b)(7)(C) makes it an unfair labor practice for an uncertified labor organization to picket an employer for more than thirty days if the picketing has a recognitional or organizational objective, and the union fails to file a § 9(c) election petition within thirty days of its commencement. *Hirsch v. Building & Construction Trades Council*, 530 F.2d 298, 303 (3d Cir. 1976). In no way does § 8(b)(7)(C) restrict picketing for other objectives. Indeed, one recognized non-recognitional objective outside of the proscription of § 8(b)(7)(C) is so-called "area standards picketing," that is, picketing for the sole purpose of compelling compliance with prevailing area wage and benefit standards. *San Francisco Local Joint Executive Board v. NLRB*, 163 U.S.App.D.C. 234, 239, 501 F.2d 794, 799 (D.C.Cir. 1974). For the "area standards" rule to apply, however, the union must have the "area standards" exception as its sole object, to the exclusion of any recognitional and organizational intent or purposes. *Id.* n. 9. Moreover, picketing under § 8(b)(7)(C) is proscribed if one of the objects of the picketing is recognitional or organizational. Nor is there any requirement that recognitional or organizational objectives either be the sole or even the principal objective. *General Service Employees Local 73 v. NLRB*, 188 U.S.App.D.C. 119, 131, 578 F.2d 361, 373 (D.C.Cir. 1978); *NLRB v. Suffolk County District Council of Carpenters*, 387 F.2d 170, 173–74 (2d Cir. 1967).

██ To establish that an object of picketing is recognitional, it need not be established that the union is seeking to gain recognition *qua* recognition. Rather, Congress proscribed as recognitional picketing any picketing that seeks to establish a union in a continuing relationship with an employer with regard to matters which could substantially affect terms or conditions of employment of his employees and which are or may be subjects of collective bargaining by a lawfully recognized exclusive representative. *Dallas Building & Construction Trades Council v. NLRB*, 130 U.S.App.D.C. 28, 31–32, 396 F.2d 677, 680–

681 (D.C.Cir. 1968); *Building & Construction Trades Council (Samuel E. Long, Inc.)*, 201 NLRB 321, 82 LRRM 1218, enf'd without published opinion, 485 F.2d 680 (3d Cir. 1973). Therefore, a recognitional object is established when a union, although purportedly picketing to maintain area standards, undertakes to go beyond a legitimate area standard object and demands that a picketed employer do more than equal the total cost package of its area contracts. For example, to attempt to dictate to the employer the distribution of benefits paid to his employees between wage and fringe benefits establishes a recognitional object under § 8(b)(7). *Local Joint Executive Board (Holiday Inns of America, Inc.)*, 169 NLRB 683, 684, 67 LRRM 1214, 1215 (1968); *Retail Clerks Local 899 (State-Mart, Inc.)*, 166 NLRB 818, 823–24, 65 LRRM 1666, 1667 (1967). In such circumstances the union's conduct is seen as an attempt to engage in *pro tanto* bargaining to gain benefits for employees it does not represent. *State-Mart, Inc., supra*, 166 NLRB at 824, 65 LRRM at 1667. Similarly, because the rationale for permitting area standards picketing is the recognition of the legitimate concern of unions that the employers with whom they have contractual relationships should not be put at a competitive disadvantage because of the cost of such contracts, a union has no legitimate concern in demanding that a picketed employer observe non-cost benefits which the union obtained for its own members. Attempts to impose such noneconomic terms of employment on the employees of other employers sounds more in terms of demanding acceptance of the area bargain than adherence to area standards. *Id. See also San Francisco Joint Board (Romay of California)*, 171 NLRB 761, 769, 68 LRRM 1187, 1188 (1968).

██ The question of picketing objectives is one of fact to be determined by the Board. In making its determination, the Board is not bound to accept the self-serving explanation given by the union as to the object of its actions. *General Service Employees Local 73 v. NLRB, supra*, 188 U.S.

App.D.C. at 132, 578 F.2d at 374; *NLRB v. Carpenters Local 2133*, 356 F.2d 464, 465–66 (9th Cir. 1966). Moreover, it is permissible for the Board to consider the totality of the union conduct. *NLRB v. Local 182, International Brotherhood of Teamsters*, 314 F.2d 53, 58–59 (2d Cir. 1963).

■ In this regard, we find it reasonable for the Board to conclude, based upon union renewal of the August, 1974, conversations in its July, 1976, conversation with Bruce Trautwein, the August 9, 1976, letter was tantamount to a recognitional demand constituting a continuation of the Union's earlier efforts to obtain recognition. In referring to the terms and conditions of employment of the Company's employees, the Union's letter casts its language in broad, sweeping terms and requires by the plain import of its language that the Company comport with the terms and conditions to be accorded its employees to those "which [have] been negotiated with contractors in the area" to avoid picketing by the Union. *State-Mart, Inc., supra*, 166 NLRB at 823–24, 65 LRRM at 1667. That the Union requests extended well beyond a request to merely comply with area standards is readily apparent when one considers that it requested the Company to maintain "the minimum standards of wages, hours, and working conditions" established by the Union for electricians in the area, and included an offer to furnish the Company with *its* standard for all three categories mentioned. This language appears to require the Company to adhere not only to area wages and hours, but also to "other working conditions which may or may not be economic in nature and which flow from a collective-bargaining agreement." *Local 437, IBEW (Dimeo Construction Co.)*, 180 NLRB 420, 421 (1969). Indeed, the Board's interpretation of the language of the August 9 letter is buttressed by the language of the picket signs which stated that the Company does not pay Union wages and conditions. This reference imports an object of bringing non-Union conditions to an end by causing the Company to recognize the Union as its employees' representative. This language clearly implies a recognitional and organizational objective. *San Francisco Local Joint Executive Board (Foodmaker, Inc., d/b/a Jack-in-the-Box)*, 203 NLRB 744, 746 (1973).

■ We hold that the Board could reasonably find that the Union's use of the term "working conditions" in its August 9 letter and the term "Union Conditions" in its picketing import a meaning to the Union's request which transcends mere compliance with area standards and instead implies that the Company adopt the terms of the Union's collective-bargaining agreement executed with other area employees. If there is an ambiguity in the Union use of the terms "working conditions" and "Union Conditions," it is resolved by the testimony of Heald. Heald testified:

> Perhaps it is a misused term with us, I don't know. We refer to working conditions as including, I suppose, *most everything in the labor agreement*, but most importantly, any monetary, and direct monetary benefits, such as the rates of wages and the *health and welfare contributions that our contractors make, the contribution they make to our apprenticeship fund, to our vacation fund* . . . . (Emphasis added.)

Heald further testified that the apprentice and training program he had in mind in the August 9 letter was the program established under the Union's collective-bargaining agreement and only the employers who are signatory to the Union labor agreement are actually allowed to make those contributions.

■ Furthermore, even in the event such picketing could be construed to be publicity or informational picketing within the meaning of the proviso to § 8(b)(7)(C) that exempts "picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization," this proviso affords the Union no defense. The purpose of the proviso is to exempt from the Act a comparatively innocuous species of picketing having the immediate purpose

of informing or advising the public, *NLRB v. Local 3, IBEW,* 317 F.2d 193, 197 (2d Cir. 1963), but to forbid picketing which has the effect of inducing employees of other employers to exert economic pressure on the picketed employer and thereby disrupt, interfere with, or curtail the picketed employer's business. *Hirsch v. Building & Construction Trades Council, supra,* 530 F.2d at 304. Here, the record shows that the effect of the picketing induced employees of Cook to stop working for two days, thereby disrupting the Company's business operation at the Lawrence project site. Nor can it fairly be said that the legend on the picket sign came within the protective proviso of § 8(b)(7)(C). Also, contrary to the Union's contention before the Board, the Union cannot escape the proscription of the proviso even if the Union did not actively coerce Cook's employees to cease performing services because the Union's picketing did, in fact, have that effect on Cook's employees. *San Francisco Local Joint Executive Board, supra,* 163 U.S.App.D.C. at 240, 501 F.2d at 800; *NLRB v. Knitgoods Workers Local 155,* 403 F.2d 388, 391 (2d Cir. 1968).

 We conclude that there is substantial evidence to support the Board's conclusion:

> The total picture . . . is that of a union which, as recently as a month before the August 9 letter, demanded recognition, and thereafter sought to achieve the same end under the guise of area standard picketing.[1] Respondent's [the union] demands not only were broader than necessary to achieve compliance with area standards, but it offered to negotiate with the Company concerning those demands, an offer which is wholly inconsistent with the asserted purpose of

its conduct. In such circumstances, its disavowal of any intent to obtain a contract must be disregarded in face of the strong inference present herein that recognition and bargaining were in fact an objective of Respondent's [the Union] picketing.[2]

 We find no merit to the Union's argument that § 8(b)(7)(C) is unconstitutional as transgressing the free speech provisions of the First Amendment. While it cannot be gainsaid that the dissemination of information concerning a labor dispute is protected by the free speech guarantee of the First Amendment, *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), it is well settled that picketing by an organized group is more than free speech. *Bakery & Pastry Drivers Local 802 v. Wohl,* 315 U.S. 769, 775, 62 S.Ct. 816, 86 L.Ed. 1178 (1942). Because picketing involves patrolling, which is not constitutionally protected, *Thornhill* and its progeny lend no "support to the contention that peaceful picketing is beyond legislative control." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 500, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949).[3] Rather, it is now recognized that the government may, in enforcing a valid public policy, "constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." *International Brotherhood of Teamsters Local 695 v. Vogt, Inc.,* 354 U.S. 284, 293, 77 S.Ct. 1166, 1171, 1 L.Ed.2d 1347 (1957). In *Vogt,* the Supreme Court upheld the state's right to prohibit peaceful picketing designed to coerce an employer to put pressure on his employee to join a union in contravention of the state policy favoring employee free choice in the selection of their representatives.

---

1. All too frequently purported area standards have been employed to mask preexisting recognitional or organizational objectives. *See, e. g., Teamsters Local 115 (Nate Ben's Reliable, Inc.),* 224 NLRB 388 (1976); *Local 492, Carpenters (Richard H. Lawrence),* 215 NLRB 263 (1974).

2. Even if recognition were not the only object of the Union's conduct, the violation is still present because recognition need only be an object of a labor organization's conduct in or-

der to render § 8(b)(7)(C) applicable. *Building Service Employees Local 87 (Liberty House/Rhodes),* 223 NLRB 30, 33 (1976).

3. See *International Brotherhood of Teamsters Local 695 v. Vogt, Inc.,* 354 U.S. 284, 77 S.Ct. 1166 (1957), for a discussion of *Thornhill* and *AFL v. Swing,* 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941) in light of subsequent cases limiting their application.

Consequently, the Congressional policy underlying § 8(b)(7)'s proscription on recognitional picketing is to preserve industrial peace in those situations where unions had previously applied economic pressure to force bargaining relationships upon unwilling employers and employees in contravention of various national labor policies. *See Dayton Typographical Union No. 57 v. NLRB, supra,* 117 U.S.App.D.C. at 94, 326 F.2d at 637; *see also* Meltzer, *Organizational Picketing and the NLRB, supra,* 30 U.Chi.L.Rev. at 83. Accordingly, the Courts of Appeals have uniformly upheld the constitutionality of § 8(b)(7). *See Local Joint Board v. Sperry,* 323 F.2d 75, 79 (8th Cir. 1963); *accord, NLRB v. Lawrence Typographical Union No. 570,* 376 F.2d 643, 654 (10th Cir. 1967); *NLRB v. Local 3, IBEW,* 339 F.2d 600, 601 (2d Cir. 1964).

■ Finally, the Union admits that its picketing was designed to force the Company to sign a prehire agreement under § 8(f) of the Act but argues that picketing in support of this objective does not violate § 8(b)(7)(C) of the Act. Actually these contentions by the Union provide further support for the Board's finding. In *NLRB v. Local 103, Iron Workers,* 434 U.S. 335, 345, 98 S.Ct. 651, 658, 54 L.Ed.2d 586 (1978), the Supreme Court specifically approved of the Board's decision in *Ruttman Construction Co.,* 191 NLRB 701, 702 (1971), that a "prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." As the Supreme Court further noted, "when the Union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *NLRB v. Local 103, Iron Workers, supra,* 434 U.S. at 350, 98 S.Ct. at 660. Thus, if there is a question whether the picketing by the Union had a recognitional objective, the Union's admission that it picketed to force the Company to sign a prehire agreement, which is "a preliminary step . . . for the development of a full bargaining relationship," further demonstrates that the Union's picketing had a recognitional objective.

■ We believe such an interpretation is consistent with Congressional intent. In *NLRB v. Local 103 Iron Workers, supra,* 434 U.S. at 348 n.10, 98 S.Ct. at 659, the Supreme Court found that "Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle." As the House Conference Report states: "Nothing in [Section 8(f)] is intended . . . to authorize the use of force, coercion, strikes or picketing to compel any person to enter into such prehire agreements." H.R. Rep.No.1147, 86th Cong., 1st Sess. 42, *reprinted in* [1959] U.S.Code Cong. & Admin. News, pp. 2318, 2514; I Legislative History of the Labor-Management Reporting Disclosure Act of 1959 at 946.

Enforcement granted.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, a majority of the three-person panel of the National Labor Relations Board has rewritten § 8(b)(7)(C) of the National Labor Relations Act, as amended 29 U.S.C. § 151 *et seq.,* to suit their own fancy, which happens to be a dislike of picketing which has as its objective the maintenance of Union standards in an area. Unfortunately, this Court now accepts the views of the panel; and, in the process, expands § 8(b)(7)(C) unjustifiably.

In my view, Member Jenkins' dissent is correct and should be followed. He states:

While it is clear that [the Union] initially sought to be recognized by the Employer as the bargaining agent for its employees, it is apparent that this original objective was influenced by two factors. First, Section 8(f) of the Act authorizes the execution of bargaining agreements between a labor organization and an employer engaged in the building and construction industry without a showing of majority status on the part of the labor organization. Consequently, it is

clear that the statutory framework naturally invites recognition requests from labor organizations directed toward employers of the type involved herein. Further, in response to [the Union's] initial recognition request made in 1974, the Employer expressly stated that at some point in the future it would be willing to voluntarily reach a bargaining agreement with [the Union]. When viewed in this light it is plain that the casual inquiry made of the Employer in July 1976 hardly constitutes the opening salvo of a full-fledged organizational or recognitional drive about to be launched by [the Union]. When its inquiry met with a negative response, [the Union], on August 9, unequivocally disavowed any interest in seeking recognition from the Employer. * * * [A] reading of [the August 9] letter as a whole serves to dispel any recognitional aura surrounding the use of the terms "working conditions" or "mutual agreement." Specifically, [the Union] noted that the Employer's lower "total labor cost" allowed it to underbid contractors whose employees had been organized, and that this adversely affected organized workers. * * *

While it is true that this Board carefully scrutinizes the true intent behind purported area standards picketing and considers events which precede as well as those which accompany picketing, there is no presumption that picketing, which on the surface is aimed solely at an area standards object, is nevertheless for a prohibited object solely due to a previous recognitional interest, absent substantial independent evidence to support such a presumption. In this case, no such independent evidence exists indicating that [the Union] continued to entertain a prohibited objective during the picketing. As shown above, the words used in the area standards letter were consistent with an exclusive area standards concern. Furthermore, there is no showing that [the Union] alternatively used one, then another, objective depending on the tactics it desired to employ momentarily. The only time [the Union] disavowed one objective and advocated another was on the occasion of the August 9 letter. Thereafter, the record is totally devoid of any attempts on the part of [the Union] or the pickets to intersperse the manifest area standards objective with a recognitional or organizational message. The picket signs used merely informed the public that the Employer did not *pay* union wages and conditions, a phrase which again clearly refers solely to economic terms. It is therefore clear that the [Union] closely adhered to a limited object that the Employer meet area standards. [Emphasis included.]

The Board's majority finding, that the Union's use of the terms "working conditions" and "Union conditions" import a meaning to the Union's request which implied a demand that the Company adopt the terms of the union collective bargaining agreement executed with other area employees, is drawn out of thin air and Heald's testimony provides no support for it. Heald made it clear that the Union's concern was that the picketed Company meet the monetary benefits in the Union contract so that they would not be able to compete unfairly with Union contractors and, thus, take work away from their employees. Such a concern is a proper one. No unfair labor practice occurs when a union engages in picketing which has, for its sole object, truthfully advised the public that some employer is operating under substandard working conditions. *Centralia Building and Construction Trades Coun. v. N. L. R. B.,* 124 U.S. App.D.C. 212, 363 F.2d 699 (D.C.Cir. 1966).