**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.**

No. 243, Docket 27851.

United States Court of Appeals Second Circuit.

Argued March 5, 1963.

Decided April 26, 1963.

194

Solomon I. Hirsh, Atty., National Labor Relations Board, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Robert Sewell, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Harold Stern, New York City (Norman Rothfeld, New York City, on the brief), for respondent.

Before CLARK and WATERMAN, Circuit Judges, and ANDERSON, District Judge.

ANDERSON, District Judge.

This case is before the court on the petition of the National Labor Relations Board for enforcement of an order issued against the respondent Union on July 18, 1962 directing it to cease and desist from picketing the United States Post Office Building in Brooklyn, New York, with the object of forcing a contractor to recognize Local 3 as the representative of its employees in violation of § 8(b) (7) (C) of the National Labor Relations Act.[1]

1. The relevant provisions of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. §§ 151 et seq.) are as follows:

" * * * (b) It shall be an unfair labor practice for a labor organization or its agents—

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees: (A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act, (B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or (C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and

The Board found the facts to be substantially as follows: In the summer of 1961, one Picoult was awarded a contract by General Services Administration to renovate the Federal Building in Brooklyn. He thereafter entered into a pre-hire agreement with Local 199 of Industrial Workers of Allied Trades to cover the needed electrical employees.[2]

Prior to the final award, Local 3 had sent a telegram to General Services Administration, protesting the award of the contract to Picoult and requesting that General Services Administration give support and assistance to the preservation of the terms and conditions of employment of members of Local 3.

On November 24, 1961, Local 3 began picketing at the Post Office; its signs read:

ELECTRICIANS
WORKING ON THIS JOB
EMPLOYED BY
PICOULT
ARE NOT MEMBERS
OF THE
ELECTRICAL WORKERS
LOCAL UNION NO. 3

ESTABLISHED 1891
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS

AFFILIATED WITH THE
A.F.L.–C.I.O.

Call GRamercy 5-3260
Union Label No. 194

Once before and once after the commencement of the picketing, Dobbins, the Local 3 business agent, demanded that Picoult make a contract with Local 3.

About December 15, 1961 Local 3 changed its signs to read:

ELECTRICIANS
WORKING FOR PICOULT
ON THIS JOB RECEIVE
SUB-STANDARD WAGES
AND INFERIOR WORKING
CONDITIONS
LOCAL UNION NO. 3

ESTABLISHED 1891
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS

AFFILIATED WITH
A.F.L.–C.I.O.

Call GRamercy 5-3260
Union Label No. 194

Some of the pickets were stationed a part of the time at the rear and side delivery areas and, therefore, were not entirely confined to the front entrances where the general public went in and out. Early in January, 1962, a driver for a trucking firm attempted to make a delivery to Picoult at the job site. As he approached the picket line he called for Picoult but a picket advised him that they were on strike and offered to call the "picket captain". The picket left and then returned with another individual who indicated that the driver was not to cross the picket line. There was another incident on November 24, 1961 in which an employee of a secondary employer refused to cross the picket line.

The Respondent claimed that the objects of the picketing were "first, to induce the employer to subcontract the electrical work to a contractor who would sign a collective-bargaining agreement with the Respondent, and failing that, to secure the cancellation of the employer's

shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or trans-

port any goods or not to perform any services. Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b). * * * "

2. The Board proceeded on the assumption that this pre-hire agreement was not a bar to a representation petition, and that Section 8(b) (7) (A) of the Act was not applicable to the picketing in question.

contract by the General Services Administration."

The Board made certain findings and conclusions and adopted those of the trial examiner not inconsistent with the Board's opinion. Its decision rested primarily, however, upon the following determinations:

" * * * we find that the Respondent picketed the Employer herein with an object of forcing or requiring it to recognize or bargain with the Respondent as the representative of its employees. The Respondent's efforts to gain recognition from the Employer and the picket sign initially used by it plainly show that the picketing began with a recognitional object.

"In the circumstances of this case, the mere change in the legend of the picket sign does not show a change in purpose of the uninterrupted picketing. It should be noted that the picket sign as changed did not reflect either of Respondent's purported objectives. This conflict between the asserted objectives and the picket sign strengthens our conclusion that the Respondent was at all times seeking recognition or bargaining from the Employer.

"We need not determine whether the Respondent's second picket sign would have satisfied the informational picketing proviso of Section 8(b) (7) (C) or, if so, whether the picketing had a prohibited effect, because we find that the picketing was not 'for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with a labor organization * * *.' The picketing at delivery entrances of the post office and the truckdriver incident, related above, demonstrate that it did not have such an informational purpose but, rather, was focused on the employees of secondary employees."

We decide that this case should be remanded for more adequate findings in the light of this opinion for two reasons: First, the Board improperly treated the wording on the two picket signs as evidence of an illegal purpose under Section 8(b) (7). Second, to the extent that the Board, in concluding that the picketing lacked an informational purpose, relied upon its previous finding that the union picketed the employer with the ultimate object of forcing or requiring it to recognize or bargain with the union, it misconstrued the import of subparagraph (C).

As to the first of these reasons, the Board appears to have disregarded or put aside the evidence of the wording of the two picket signs and a consideration of whether or not the language used was, on its face, within the permissive scope of the statute. Standing by itself the wording of both the first and second picket signs appears to come within the permissive terms of the second proviso. However, in its opinion the Board concluded that the first picket sign, together with the efforts to gain recognition from the employer, showed that the picketing began with a recognitional objective. It then went on to say, regarding the second picket sign, that it did not show a change in purpose nor, as changed, did it reflect either of respondent's purported objectives. The Board found that this was strongly corroborative of the conclusion it had previously reached that the respondent was at all times seeking recognition or bargaining.

There are doubtless cases where the wording of a picket sign may mean one thing standing alone and something quite different in the circumstances under which the sign is displayed or used, but the Board did not make any such finding about the second sign. It finds the second sign to be strong supporting evidence that the respondent was at all times seeking recognition or bargaining because the sign "did not reflect either of Respondent's purported objectives." The second proviso, however, does not re-

quire, for inclusion within its permissive scope, that the signs truthfully advise the public of the union's purported objectives. All that is required is wording which advises, in a truthful manner, "that an employer does not employ members of, or have a contract with, a labor organization * * *."

■ In treating the wording as it did, the Board failed to apply what this court said regarding the use of permissive wording on signs as proof of picketing directed to organized labor groups and employees of secondary employers to compel recognition.

"* * * In considering this question, the fact that the union carried signs expressly allowed by the statute should not be a basis for concluding that the union had a recognitional objective." McLeod v. Chefs, Cooks, Pastry Cooks and Assistants, Local 89, Hotel and Restaurant Employees and Bartenders International Union, AFL-CIO, 2 Cir., 280 F.2d 760 at 764.

This does not mean that evidence that signs were being carried and that the subject matter of the signs concerned a labor-management dispute may not be considered in finding that the activity was in fact a picket line or in finding other facts relevant to issues under Section 8(b) (7) (C). Here, however, the Board clearly misused the *wording* of the signs as evidence that the union had from the first picketed and continued to picket for an illegal purpose.

The second reason for remanding this case is that the Board appears to have misconstrued the import of Section 8(b) (7) (C).

If the Board's opinion had centered upon the issue of absence of informational purpose in the picketing and had demonstrated a consideration of all of the relevant evidence bearing upon this, including the history of the picketing from its beginning, and a logical discussion of the factors which led to the Board's con-

clusion, its decision might well have stood. But as the opinion is written it is impossible to discover how much its finding of an absence of informational purpose was influenced or colored by its refusal to determine whether the wording of the signs was, as such, permissive under the second proviso, or by its declaration that the second picket sign "did not reflect either of Respondent's purported objectives" or by its threshold conclusion that the picketing was carried on "with an object of forcing or requiring the employer to recognize or bargain." With regard to the last mentioned conclusion, the Board seems to have proceeded on the premise that Section 8(b) (7) (C) deals with organizational or recognitional picketing, except for the second proviso of subparagraph (C) which deals with an entirely separate kind or category of picketing, i. e., informational picketing, and that the two categories are somehow mutually exclusive. It seems, however, much more realistic to suppose that Congress framed a general rule covering the field of recognitional and organizational picketing, conducted under alternate sets of circumstances described in subparagraphs (A), (B), and (C), and then excepted from the operation of the rule, as it applied to the circumstances set forth in subparagraph (C), a comparatively innocuous species of picketing having the immediate purpose of informing or advising the public, even though its ultimate object was success in recognition and organization.

Looking at Section 8(b) (7) of the 1959 Act as a whole, it is apparent that it does not proscribe all recognitional picketing but only that which comes within the terms of the three "where" clauses, A., B., or C. For an unfair labor practice by the union to exist under 8(b) (7) (C) on the facts here alleged, the picketing must have been carried on under two conditions both of which must be operative at the time: (1) the picketing must have had as an object the forcing or requiring of an employer to recognize or bargain with a labor organiza-

tion, etc.; and (2) such picketing must have been conducted without a petition under 9(c) having been filed within a reasonable period of time not to exceed thirty days, etc. (subsection C).

The Board has found that these two conditions exist here. But the second of these conditions is limited by two provisos, and this case is particularly concerned with the second of these provisos which says,

"* * * nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, * * *."

If, therefore, the union's picketing in this case came strictly within the "truthfully advising" provision of the second proviso and nothing more, the union would have no duty to file a petition under 9(c). In other words, the main provision of subparagraph (C) would be inoperative and the second of the two conditions, the existence of both of which are required for the finding of an unfair labor practice under Section 8(b) (7), would not apply.

Subparagraph (C) goes on in the "unless" clause to provide that if an effect of the informational picketing "is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services," the second of the main conditions remains in full force and the picketing is no longer permissive.[3]

One of the principal difficulties in construing and applying subparagraph (C) is that Section 8(b) (7) contains the partially synonymous words, "object" and "purpose", used in two distinct contexts but to which much of the same evidence is relevant. These are: "where an object thereof is forcing or requiring an employer to recognize or bargain * *" and "for the purpose of truthfully advising the public * * *." It does not necessarily follow that, where an object of the picketing is forcing or requiring an employer to recognize or bargain, the purpose of the picketing, in the context of the second proviso, is not truthfully to advise the public, etc. The union may legitimately have a long range or strategic objective of getting the employer to bargain with or recognize the union and still the picketing may be permissive. This proviso gives the union freedom to appeal to the unorganized public for spontaneous popular pressure upon an employer; it is intended, however, to exclude the invocation of pressure by organized labor groups or members of unions, as such.

█ The permissible picketing is, therefore, that which through the dissemination of certain allowed representations, is designed to influence members of the unorganized public, as individuals, because the impact upon the employer by way of such individuals is weaker, more indirect and less coercive.

█ In this connection what is meant by "advising the public," as used in the second proviso, is highly pertinent. Congress expressly provided that the word "public" should not be so narrowly construed as to exclude consumers, but the whole context of the phrase in which it appears makes it clear that it was not intended to be so broadly defined as to include organized labor groups which, at a word or signal from the picketeers, would impose economic sanctions upon the employer; otherwise Section 8(b) (7) would be, in effect, almost entirely

3. The Board drew no conclusion as to whether or not the case came within the "unless" clause, and this Court's opinion does not discuss the applicability of that clause to the present case. This fact, however, should not be construed as foreclosing the Board from considering the applicability of that clause to evidence before it in the proceedings on remand.

emasculated. By this latest amendment to the Taft-Hartley Act Congress sought to circumscribe a kind of picketing which, by its nature, could in most cases bring an employer to his knees by threatening the destruction of his business and which, because of the attendant loss of employment, had a material tendency to coerce employees in their freedom to accept or reject union membership or freely select the union they wanted to represent them.

Professor Cox of Harvard, now Solicitor General, who worked with the Senate Labor Committee Chairman on the Section 8(b) (7) amendment to the Taft-Hartley Act, has said,

> "Picketing before a union election is divided by section 8(b) (7) into two categories: (1) picketing which halts pick-ups or deliveries by independent trucking concerns or the rendition of services by the employees of other employers, and (2) picketing which appeals only to employees in the establishment and members of the public. * * * The theory is that the former class of picketing is essentially a signal to organized economic action backed by group discipline. Such economic pressure, if continued, causes heavy loss and increases the likelihood of the employer's coercing the employees to join the union. In the second type of picketing, the elements of communication predominate. If the employer loses patronage, it is chiefly because of the impact of the picket's message upon members of the public acting as individuals * * *." The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minnesota Law Review 257.

Although the two categories are described by him in terms of the *effect* of each, the express language of the second proviso uses the words "for the purpose of" and it is difficult to see how they can be ignored. Nevertheless, the description of the two categories is helpful in gaining insight to the second proviso. The concepts of "signal" picketing and "publicity" picketing should be used in characterizing the union's tactical purpose rather than in describing the picketing's effect. Yet purpose can be determined only through what is said and done under certain circumstances; and the effect of the picketing is one of the circumstances considered in determining in any case what the purpose was in so far as it is the natural and logical consequence of what the picketeers are saying and doing.

The effect might fall short of "inducing any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services" and still be evidence of non-permissive purpose, such as display of qualifying signs accompanied by hostile gestures; or speech directed to persons unconnected with organized labor and not employees of secondary employers, such as a casual passer-by; or, for example, by forming a shoulder to shoulder picket line across an entrance which affected only members of the unorganized public who were not employees of a secondary employer.

Under the second proviso it is the difference in purpose which determines which is permissible picketing and which is not. In its context the second proviso means in terms of "signal" and "publicity" picketing that while most picketing with a "signaling" purpose is proscribed, most picketing for publicity is protected; the exceptions are that signal picketing is permissible when an object thereof is not forcing or requiring an employer to recognize or bargain, and publicity picketing is proscribed when it communicates more than the limited information expressly permitted by the second proviso or when it is apparently the purpose to advise organized labor groups or their members as shown by signal effects, unless there is persuasive proof that those effects are inspired by

the employer who is seeking thereby to prevent legitimate second-proviso picketing by the union.

■ The Board must, therefore, approach its conclusion as to whether or not the picketing was "for the purpose of truthfully advising the public" by way of a finding of whether or not the union's tactical purpose was to signal economic action, backed by organized group discipline.

Accordingly the case is remanded.