HIRSCH, Peter W., Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board

v.

BUILDING AND CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA AND VICINITY, AFL–CIO, Appellant.

Nos. 75–1586 and 75–1587.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1975.

Decided Feb. 4, 1976.

Bernard N. Katz, Richard B. Sigmond, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for appellant.

John W. Pelino, Max L. Lieberman, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., for amicus.

Michael H. Malin, White & Williams, Philadelphia, Pa., for Strescon Industries, Inc.

Joseph E. Mayer, Asst. Gen. Counsel, Robert T. Kofman, Atty., N. L. R. B., Washington, D. C., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

This is a consolidated appeal from two orders of the district court granting petitions brought by the Regional Director of the National Labor Relations Board (the "Board") for temporary injunctions against the Building and Construction Trades Council of Philadelphia and Vicinity (the "Trades Council") pursuant to § 10(*l*) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 160(*l*). The injunctions were issued pending final disposition of the matters involved by the Board on the ground that the Regional Director had "reasonable cause to believe" that the Trades Council had violated § 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C), which prohibits "recognitional" and "organizational" picketing under certain circumstances and § 8(b)(4)(ii)(B), 29 U.S.C. § 158(b)(4)(ii)(B), one of the NLRA's "secondary boycott" provisions. In addition, the charging party in the § 8(b)(7)(C) actions, Altemose Construction Co. ("Altemose"), seeks intervenor status in this Court.

## A. THE FACTUAL BACKGROUND:[1]

The Trades Council is a union composed of affiliated labor organizations in the building and construction industry in the Philadelphia area. For some time, it has attempted to secure a "sub-contractor's agreement" with Altemose, a non-union employer. This agreement would require Altemose to employ only unionized sub-contractors in its construction projects. To protest Altemose's continued refusal to sign such an agreement, the Trades Council began picketing Alte-

---

1. Our narrative of the events giving rise to this litigation is drawn from the district court's findings of fact.

mose's main office and construction jobsites on January 20, 1975. Throughout the course of the picketing, respondent's members displayed signs bearing the following legends:

NOTICE
Altemose Contractor
Refuses to enter into
a Sub-Contractor's
Agreement with the
Philadelphia, Pennsylvania
Building & Construction
Trades Council, AFL–CIO;

TEAMSTERS
PICKET LINE
PLEASE HONOR; and

SLOW DOWN
LOW WAGE
AREA AHEAD

Although all of Altemose's operations were picketed, the events giving rise to the unfair labor practice charges against the Trades Council occurred, for the most part, in the vicinity of Altemose's Valley Forge Towers project, the largest project it had under construction.

### 1. *The § 8(b)(7)(C) Charge:*

The picket lines established by the Trades Council did not bring activities to a halt at any of the Altemose projects. However, they did disrupt the work in progress to a certain extent, at least at the Valley Forge Towers site. There, Ralph D. Williams, the Trades Council's business representative in charge of the picketing, appealed directly to deliverymen employed by Altemose's suppliers to honor the picket line. As a result of his appeals and the picket line itself, a number of scheduled deliveries were either never completed or delayed.

While the picketing was in progress, Thomas Magrann, the Trades Council's business manager, and J. Leon Altemose, Altemose's president, appeared together on a local Philadelphia radio show to debate the controversy between them. During the talk show, Magrann made a number of comments concerning the purpose of the Trades Council's picketing of the Altemose projects. For example, he stated that the Trades Council was at-tempting "to get Mr. Altemose, to you know, sign a Building Trades agreement". In addition, he expressed his desire to resolve the long dispute between Altemose and the Trades Council. In this regard, he indicated that he would gladly "sit down and negotiate something with Mr. Altemose". Magrann also stated that the Trades Council would accept Altemose's employees "into the union without no initiation fees and no test".

When the picketing persisted for more than thirty days and the Trades Council failed to petition for a representation election under § 9(c) of the NLRA, 29 U.S.C. § 159(c), during that period, Altemose filed a § 8(b)(7)(C) unfair labor practice charge against it with the Board. After investigation, the Regional Director determined that there was reasonable cause to believe that § 8(b)(7)(C) had been violated and he therefore petitioned the district court for a temporary injunction to restrain the allegedly illegal picketing.

### 2. *The § 8(b)(4)(ii)(B) Charge:*

Strescon Industries, Inc. ("Strescon") was under contract with Altemose to supply the Valley Forge Towers project with precast, prestressed concrete planks of a unique design and length. Deliveries under this contract were scheduled on a two week cycle with approximately eighty to ninety deliveries to occur in any given two week period. The normal delivery procedure called for Strescon drivers to haul loaded tractor-trailers to the construction site, leave the trailers to be unloaded by Altemose employees, and return with any empty trailers from a previous delivery.

On January 24, 1975, four days after the picketing had ensued, fourteen Strescon drivers were sent to the Valley Forge project to pick up approximately thirty empty trailers. However, upon arriving at the construction site, the drivers, all members of Teamsters Local 384, decided to honor the Trades Council's picket line upon the request of Williams, its business representative. Since

it needed the trailers to fulfill commitments elsewhere, Strescon soon arranged with the Teamsters Local for its members to cross the picket line for the limited purpose of removing the empty trailers. However, the drivers continued to refuse to cross the picket line to make any of the scheduled deliveries. As a result, only one of the approximately ninety deliveries scheduled between January 20 and February 18 was completed.

Because of the refusal of its drivers to cross the Trades Council's picket line, Strescon contracted with Raritan Motor Express ("Raritan") to make its deliveries to Altemose for it. Pursuant to this agreement, Raritan drivers began delivering concrete planks to the Valley Forge project on February 18. During that afternoon, Russell Dobson, a Raritan driver, was waved over to the roadside as he approached the construction site by Trades Council pickets, including Williams. Dobson was asked by Williams if he intended to cross the picket line. He responded affirmatively, stating that he had been out of work for six months and that he had to support his family. Williams warned him that if he "didn't want to be out of a job another six months [he] shouldn't deliver to the [Valley Forge] Towers jobsite". Dobson, however, ignored this remark and completed his delivery.

Later that same afternoon, John Hogarth, Strescon's operations manager, received a phone call from an individual who identified himself as "Mr. Ralph Williams of the Building & Trades Council". The caller asked Hogarth if he had anything to do with the deliveries being made to the Valley Forge project. After Hogarth admitted that he did, the caller stated that Strescon had "double dealt" the Trades Council for it had understood that only empty trailers would be removed from the job-site. Hogarth informed the caller that Raritan, rather than Strescon, was making the deliveries and that Strescon intended to fulfill its contractual obligations to Altemose. He was then told not to be "surprised if you have pickets on your plant tomorrow".

In addition, the caller stated that Strescon was "stupid to be doing business with Altemose".

The very next day, Strescon filed a § 8(b)(4)(ii)(B) charge against the Trades Council alleging that it had violated the secondary boycott provisions of the NLRA. After investigation, the Regional Director determined that there was reasonable cause to believe that the Trades Council had violated this provision, and he, therefore, petitioned the district court for a § 10(*l*) injunction.

## B. ISSUES ON APPEAL:

### 1. *The § 10(l)* Injunctions:

A § 10(*l*) injunction is interlocutory in nature and remains in effect only pending the Board's final resolution of the underlying unfair labor practice charges. The injunction procedure itself reflects Congress' belief that certain unfair labor practices are so disruptive of commerce that, upon a proper showing by the Regional Director, they should be enjoined pending the disposition of the matter by the Board. S.Rep. No. 105, 80th Cong., 1st Sess., pp. 8, 27.

Since the § 10(*l*) proceeding is thus ancillary to the main unfair labor practice action committed to the Board's exclusive jurisdiction, the Regional Director faces a relatively insubstantial burden of proof when he petitions a district court for temporary injunctive relief pursuant to § 10(*l*). He need not prove that a violation of the NLRA has in fact occurred. Nor must he convince the district court of the validity of the legal theory upon which he predicates his charges. Both questions are for the Board's determination in the first instance, subject to the right of appellate review. Rather, he need only demonstrate that he has reasonable cause to believe that the elements of an unfair labor practice are present and that the legal theory upon which he proceeds is "substantial and not frivolous". *Samoff v. Building & Construction Trades Council of Phila. & Vicinity,* 475 F.2d 203 (3d Cir. 1973), *vacated for mootness,* 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44

(1973); *Schauffler v. Local 1291, International Longshoremen's Ass'n,* 292 F.2d 182 (3d Cir. 1961).

■ Similarly, the scope of appellate review is extremely limited in the event the district court determines that the Regional Director has satisfied his burden of proof and enjoins the challenged activities. Its findings will not be disturbed on appeal unless they can be said to be "clearly erroneous". *Schauffler, supra.*

While acknowledging the Regional Director's relatively light burden of proof in a § 10(*l*) proceeding, the Trades Council nevertheless asserts that the district court erred in granting the relief sought. The "reasonable belief" standard, it argues, requires that, at a minimum, the Regional Director demonstrate a rational basis for believing that the NLRA has been violated. To do so, he must place into the record "hard evidence" indicating that the elements of the alleged unfair labor practice are in fact present. This, it claims, he failed to do with respect to both the § 8(b)(7)(C) and § 8(b)(4)(ii)(B) charges. We will consider the specific allegations of error *seriatim* below.

*The § 8(b)(7)(C) Charge:*

■ Section 8(b)(7)(C) makes it an unfair labor practice for a union to picket an employer for more than thirty days if that picketing has a "recognitional" or "organizational" objective, and the union fails to file a petition for a representation election pursuant to § 9(c) of the NLRA within thirty days of its commencement. The Trades Council does not contest the fact that it picketed Altemose's operations for more than the permissible period without filing for a representational election. However, it contends that the district court erred in finding that the Regional Director had reasonable cause to believe that this provision had been violated because the evidence in the record fails to establish that the picketing was conducted for either of the purposes proscribed by § 8(b)(7)(C). In the alternative, it argues that even if

the picketing would be otherwise prohibited by the NLRA, in this instance it was protected by the so-called "publicity proviso" to § 8(b)(7)(C).

■ Turning to the Trades Council's first argument, we cannot say on the basis of the record before us that the district court erred in finding that there was reasonable cause to believe that the Trades Council's picketing was conducted with the objectives prohibited by § 8(b)(7)(C) in mind. Both the picket signs displayed by its members and Magrann's own statements during the radio debate indicate that the Trades Council hoped to secure a "sub-contractor's agreement" with Altemose through its picketing. The Board has held, in an order enforced by this Court, that picketing directed at obtaining such an agreement with an employer that does not recognize the union for bargaining purposes has the proscribed "recognitional" purpose as at least one of its objectives. *Building & Construction Trades Council of Philadelphia and Vicinity (Sam E. Long, Inc.),* 201 NLRB 321 (1973), enf'd, 485 F.2d 680 (3d Cir. 1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1938, 40 L.Ed.2d 288 (1974). *Accord Lane-Coos-Curry-Douglas Counties Bldg. & Con. Trades Council v. N. L. R. B.,* 415 F.2d 656 (9th Cir. 1969); *Dallas Building & Construction Trades Council v. N. L. R. B.,* 130 U.S.App.D.C. 28, 396 F.2d 677 (1968). This is so because an employer's right to subcontract is considered a mandatory subject of collective bargaining in light of the substantial impact that subcontracting can have on the terms and conditions of employment of his employees. *Fibreboard Paper Products Corp. v. N. L. R. B.,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). A union is thus deemed to be seeking recognition as the employee's bargaining agent when it pickets an employer for a "sub-contractor's agreement" because it is then attempting to secure a contract which affects the terms and conditions of employment of those employees.

■ Nor can we say that the district court was clearly erroneous in concluding

that there was reasonable cause to believe that the picketing had an "organizational" purpose as well. As previously noted, Magrann stated during the radio debate that the Trades Council would accept Altemose's employees into the union without an initiation fee or test. This statement alone, coming from the Trades Council's chief executive officer, suggests that the Council was seeking to organize Altemose's non-union labor force. In addition, throughout the course of the debate Magrann expressed a great interest in the wages and working conditions of Altemose's employees. Finally, he indicated that he would gladly sit down and negotiate with Altemose at any time in order to settle the long dispute between them.

Keeping in mind the preliminary nature of a § 10(*l*) proceeding and the light burden of proof confronting the Regional Director in these matters, we believe that these statements substantiate sufficiently the district court's conclusion that the Trades Council was attempting to force Altemose's employees to accept it as their bargaining agent through its picketing of their employer. Consequently, if the picketing was unprotected by the "publicity proviso" to § 8(b)(7)(C), the district court committed no error in issuing the challenged injunction.

The so-called "publicity proviso" permits picketing otherwise violative of § 8(b)(7)(C) because of its "organizational" or "recognitional" objectives if it is conducted for the limited "purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization" and it does not have the effect of substantially disrupting or interfering with the picketed employer's business. The Trades Council contends that the district court erred in denying it the protection of this proviso since its picketing merely informed the general public of Altemose's refusal to enter into a "sub-contractor's agreement" and it failed to have the requisite adverse impact on Altemose's operations.

Once again, however, we cannot agree with the Trades Council's position. The "publicity proviso" only exempts from the proscriptions of § 8(b)(7)(C) what the Second Circuit has termed "a comparatively innocuous species of picketing, having the immediate purpose of informing or advising the public" of an employer's non-union policies, and that, only when no substantial curtailment of his business results. *N. L. R. B. v. Local 3, I. B. E. W.*, 317 F.2d 193 (2d Cir. 1963). It affords no protection whatsoever to picketing that is designed to appeal to other organized labor groups to exert economic pressure on an employer, regardless of the actual impact of that appeal. *N. L. R. B. v. Local 3, I. B. E. W., supra; Brotherhood of Carpenters and Joiners of America, Local 1849 (Robert Young Developments, Inc.)*, 208 NLRB 461 (1974).

We believe that the evidence introduced by the Regional Director below established sufficiently for purposes of a § 10(*l*) proceeding that the Trades Council's picketing fell within the latter, prohibited category of "signal" picketing, and outside the protections of the proviso. For example, one of the signs displayed by the pickets at the Valley Forge site appealed directly to the Teamsters by name to honor the picket line. In addition, there was ample evidence that the pickets, including Ralph Williams, requested deliverymen employed by Altemose's suppliers to refrain from crossing their line. Indeed, Williams himself testified that he wanted his picket line to be "effective" and conceded that this meant that he hoped Altemose's suppliers would honor it. Certainly, this evidence raised a question as to the applicability of the "publicity proviso" which only the Board could resolve.

Moreover, even assuming that there was no evidence indicating that the Trades Council had engaged in impermissible "signal" picketing, we would refuse to override the district court's injunction. The Trades Council's picketing would only enjoy the protection of the

"publicity proviso" if it did not result in a substantial disruption of Altemose's business. However, the Regional Director introduced evidence showing that quite a number of deliveries were either delayed or prevented by the Trades Council's actions. During the initial three weeks of the picketing, Altemose did not receive approximately ninety scheduled deliveries of Strescon's unique concrete planks, essential to the Valley Forge project, as a result of the refusal of Strescon's deliverymen to cross the Trades Council's line. In addition, the picket line prevented the scheduled deliveries of at least two of Altemose's other suppliers and delayed essential telephone repair service at the Valley Forge site.

We also note that there was no evidence of an attempt on the part of the Trades Council to minimize the adverse impact of their picket line on Altemose's operations. On the contrary, the only evidence introduced indicated that the Trades Council actively sought to halt the flow of goods and services to the Altemose construction sites. We believe that the introduction of this evidence concerning the adverse effect of the Trades Council's picketing on Altemose's business satisfied the Regional Director's light burden of proof in the district court. Whether or not the Council's activities constituted a "substantial disruption" of Altemose's business is, of course, an issue to be determined by the Board.

We therefore find no error in the district court's conclusion that the Regional Director had reasonable cause to believe that § 8(b)(7)(C) had been violated by the Trades Council.

### The § 8(b)(4)(ii)(B) Charge:

Section 8(b)(4)(ii)(B), one of the NLRA's secondary boycott provisions, prohibits a union from exerting indirect economic pressure on the employer with whom it has its primary dispute by attempting to force neutral employers or individuals to sever business relations with its primary adversary through threats, coercion, or restraints. Relying primarily on the evidence of the phone call allegedly placed by Ralph Williams to Strescon, the district court concluded that there was reasonable cause to believe that the Trades Council had violated this provision. As previously noted, this phone call threatened Strescon with picketing in the event the delivery of its product to Altemose continued.

On appeal, the Council contends that the district court erred in admitting the phone call evidence because John Hogarth, the recipient of the call, was unable to identify Williams as the caller. Hence, it asserts that there was no record basis for the district court's decision. Alternatively, the Trades Council maintains that even if the evidence concerning the call was properly received below, it was undeserving of any probative value and, therefore, an insufficient basis on which to predicate the issuance of a § 10(l) injunction.

Treating the Council's arguments in converse order, we are satisfied that if Hogarth's testimony concerning the phone call was properly admitted below, the Regional Director satisfied his burden of proof with respect to the § 8(b)(4)(ii)(B) charge. In substance, the Council suggests that the call could not be considered a "threat" of illegal picketing because there was no evidence that the Trades Council had any serious intention of engaging in such conduct. In an apparent effort to substantiate this claim, it points to the fact that no picketing of Strescon ever occurred. We, however, cannot comprehend how the phone call can be interpreted as anything other than a threat of illegal activity. Certainly, both the tenor and terms of the conversation marked it as such. Moreover, it occurred in the context of a long and bitter dispute between Altemose and the Trades Council, a dispute of which Strescon was fully aware. Finally, Strescon itself considered it a threat as evidenced by the unfair labor practice charges it immediately filed against the Council.

The mere fact that the Trades Council failed to carry out its threat can

have no bearing whatsoever on the nature of the phone call. We, therefore, agree with the district court that the phone call constituted a threat against Strescon. And, of course, a single threat of such economic retaliation against a neutral is sufficient to violate § 8(b)(4)(ii)(B). *N. L. R. B. v. Local 254, Building Service Employees Int'l Union,* 359 F.2d 289 (1st Cir. 1966); *Truck Drivers, Local 705, Teamsters (Johns-Manville Products Corp.),* 205 NLRB 387 (1973), *enf'd,* 166 U.S.App.D.C. 92, 509 F.2d 425 (1974).

Having disposed of Council's alternative argument, we turn to the main issue in this aspect of the appeal—whether Hogarth's testimony concerning the threatening phone call was properly admitted below. The district court found Hogarth's testimony to be competent, despite his inability to identify Williams' voice, under the rule announced in *Commonwealth v. DeRohn,* 444 Pa. 334, 282 A.2d 256 (1971).[2] There, the Pennsylvania Supreme Court held that the recipient of a call could testify to the conversation whenever the caller's identity could be established by any sufficient evidence, including circumstantial evidence. Applying this rule, the district court concluded that the circumstances surrounding the call indicated that it had been placed by Williams. On appeal, the Trades Council does not dispute that the *DeRohn* case governs the admissibility of the testimony in question. However, it asserts that the circumstances surrounding this particular call could only support a conclusion that it was from an "anonymous prankster", rather than Williams, and that therefore the district court erred in admitting Hogarth's testimony against it.

■ Our examination of the record, however, fails to disclose any error in the district court's admission of Ho-

garth's testimony. The circumstantial evidence pointing to Williams as the maker of the call was both substantial and persuasive. In the first place, the caller identified himself as "Mr. Ralph Williams of the Building & Trades Council". Williams was, in fact, its agent in charge of picketing at the Valley Forge site. The phone call was placed on the afternoon of February 18 and complained of the renewed deliveries of Strescon materials to the Valley Forge project. Earlier that same afternoon, Williams had stopped Russell Dobson, a Raritan driver, and learned for the first time that Raritan was making Strescon's deliveries. Hence, both the timing and subject matter of the call indicate that Williams did in fact place it. Finally, the caller alluded to the earlier agreement permitting Strescon to remove its empty trailers from the Valley Forge site. Certainly, Williams, in charge of the Valley Forge pickets, would be aware of both this earlier arrangement and Strescon's delivery procedure of leaving trailers to be unloaded by Altemose's employees.

On the other hand, the evidence cited by the Council as support for its conclusion that some "prankster" placed the call is entirely unconvincing. No nexus exists between the call in question and prior anonymous complaints of the Council's activities to the local Sheriff. This particular call was not anonymous; it was not to the Sheriff; and it threatened, rather than complained of, picketing by the Council. In fact, there was no evidence whatsoever of any similar calls to a neutral employer. Nor does Williams' denial of placing the call affect the admissibility of Hogarth's testimony. If anything, his denial raises a question of credibility for the Board to resolve in the main unfair labor practice proceeding. Consequently, we hold that the rel-

---

**2.** At the time of the proceeding below, the new federal rules of evidence were not yet in effect. Hence, the district court's actions were governed by Rule 43(a) of the Federal Rules of Civil Procedure. This rule directs a federal district court to admit evidence whenever ad-

mission would be permissible under either the rules of evidence of the state in which the court sits or a rule or statute of the United States. Here, the court, sitting in Pennsylvania, applied the Pennsylvania rule favoring the admission of Hogarth's testimony.

evant circumstantial evidence was sufficient to establish Williams' identity as the caller for purposes of the *DeRohn* rule. Accordingly, Hogarth's testimony was properly admitted by the district court.

We therefore find no error in the district court's decision to issue a § 10(*l*) injunction against the Trades Council in order to restrain any further violations of § 8(b)(4)(ii)(B).

### 2. *Intervention by Altemose*

Altemose seeks to intervene in this appeal,[3] although it made no similar motion in the district court, because it believes that the Regional Director has failed to protect adequately both its interests and those of the general public throughout the course of its dispute with the Trades Council. In particular, it is dissatisfied with an agreement entered into between the Regional Director and the Trades Council subsequent to the proceedings below. This agreement permitted the Trades Council to resume picketing after a cessation of twenty-one days in the event there was no further evidence of the recognitional or organization objectives proscribed by § 8(b)(7)(C). Altemose's motion to intervene has been opposed by both the Regional Director and the Trades Council.

Although no rule of appellate procedure or statute either authorizes or prohibits the intervention of a charging party in an appeal from a § 10(*l*) proceeding, Altemose asserts that this Court may, under the proper circumstances, permit such intervention pursuant to its discretionary powers.[4] It argues that such circumstances are present when, as here, the actions taken by the Regional Director, allegedly in the public interest, would sacrifice the private interests of the charging party involved. While conceding that the Regional Director is

charged with protecting public, as opposed to private, interests when he seeks a § 10(*l*) injunction, it maintains that a strict dichotomy between the two is fictitious. Rather, the NLRA contemplates an interblending of the public and private rights at stake because, in the final analysis, it is the disruption of the charging party's business that a § 10(*l*) injunction seeks to terminate. Consequently, it contends that the actions of the Regional Director may, at times, make the intervention of a charging party appropriate in order to both protect and keep in proper perspective the private rights at stake. In support of this proposition, Altemose cites *International Union, U. A. A. A. I. W., Local 283 v. Scofield,* 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965), in which the Supreme Court recognized that a charging party may have rights protectable in a federal court, and, therefore, granted intervention as a matter of right in a Court of Appeals proceeding to review or enforce a Board order.

Even assuming the factual validity of Altemose's charges against the Regional Director, we believe that the intervention it seeks is foreclosed by the plain language of § 10(*l*). Section 10(*l*) was enacted as a narrow exception to the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.,* which, for the most part, deprived the federal courts of all power to issue a labor injunction. Since the jurisdiction of the federal courts to issue a § 10(*l*) injunction is predicated on this exception, its language cannot be accorded a more expansive interpretation than that clearly within the intent of Congress.

Although § 10(*l*) does not speak to the appellate stage of a § 10(*l*) proceeding, it clearly delineates the respective rights and duties of both the charging party and the Regional Director in the district

---

**3.** Altemose has been previously granted *amicus curiae* status in this Court.

**4.** Altemose maintains that Rule 2 of the Federal Rules of Appellate Procedure authorizes this Court to permit intervention "[i]n the interest

of expediting decision, or for other good cause shown". In light of our disposition of Altemose's motion, we find it unnecessary to express an opinion as to the scope of our discretionary powers under this rule.

court. By its very terms, it authorizes only the Regional Director to petition for temporary injunctive relief when he has reasonable cause to believe that certain provisions of the NLRA have been violated. At the same time, the role of the charging party is strictly circumscribed. Rather than granting it the status of a full party litigant, § 10(*l*) limits his participation to an appearance by counsel and an opportunity to present testimony. That Congress should thus limit the role of the charging party reflects its desire that § 10(*l*) should be utilized only in the public's behalf. As the Senate report on the provision stated:

> "[W]e have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief . . . in the case of strikes and boycotts defined as unfair labor practices." S.Rep. No. 105, 80th Cong., 1st Sess. at 8.

In seeking intervention at the appellate level, Altemose asks this Court to expand the specific limited rights conferred upon it by § 10(*l*), for, if its motion were granted, it would attain the status of a full party litigant. It thus seeks to acquire rights indirectly through intervention which Congress has deemed to deny it in the first instance. We believe, however, that the limits placed on the charging party's participation in the district court must apply, *a fortiori*, in this Court also. To hold otherwise and extend Altemose intervenor status would run counter to both the plain language of § 10(*l*) and the congressional policy embodied therein. *See, Sears, Roebuck & Co. v. Carpet, etc., Local Union No. 419*, 410 F.2d 1148 (10th Cir. 1969); *Henderson v. International Union of Operating Engineers, Local No. 701*, 420 F.2d 802 (9th Cir. 1969); *see also, Solien v. Misc. Drivers & Helpers Union, Local No. 610*, 440 F.2d 124 (8th Cir. 1971). Consequently, Altemose's motion to intervene on appeal will be denied. It is not our function to express an opinion on the wisdom of the Congressional limitation.

One final matter is worthy of note on the intervention issue. We believe that Altemose's reliance on the Supreme Court's decision in *Scofield* is unfounded. A § 10(*l*) proceeding is of a completely different nature than that considered by the Court in *Scofield*. As a result, the policy considerations, such as the prevention of duplicate appeals and circuit shopping, which persuaded the Supreme Court to allow the prevailing party before the Board to intervene in the appellate proceeding to review or enforce the agency's final order are totally absent. *Scofield* thus has little or no applicability in the § 10(*l*) context.

Accordingly, the orders of the district court will be affirmed and Altemose's motion to intervene will be denied.