Louis V. **BALDOVIN**, Jr., et al.

v.

**INTERNATIONAL ALLIANCE OF THE-ATRICAL STAGE EMPLOYEES & MOVING PICTURE MACHINE OPER-ATORS OF the UNITED STATES AND CANADA, AFL–CIO, LOCAL 279.**

Civ. A. No. H–83–4700.

United States District Court, S.D. Texas, Houston Division.

Sept. 13, 1983.

Robert S. Breaux, Houston, Tex., for plaintiffs.

Chris Dixie, Chris Dixie & Associates, Houston, Tex., for defendant.

## ORDER

CARL O. BUE, Jr., District Judge.

Petitioner Baldovin, on behalf of the National Labor Relations Board, (hereinafter "the Board"), seeks to have this Court enjoin the picketing now in progress in front of the Bay Plaza Twin movie theater in Bay City, Texas. The Board alleges that the respondent (hereinafter "Union") pickets with the object of obtaining the employer's recognition of the Union as the bargaining representative of the movie projectionists, a violation of Section 8(b)(7)(C) of the National Labor Relations Act (hereinafter "the Act"). 29 U.S.C. § 158(b)(7)(C) (1973).[1] Since the theater does not employ any such projectionists at the present time, the Board claims that the picketing is to force a pre-hire agreement which it submits is unlawful under Section 8(f) of the Act. 29 U.S.C. § 158(f) (1973).

The Union argues that its picketing is lawful under the second proviso of Section 8(b)(7)(C) which allows picketing to inform the public that the employer does not employ union members or does not have a contract with the union. Additionally, the Union contends that Section 8(b)(7)(C) is inapplicable because without any employees, an election petition as required under the subject provision would be a futile gesture.

The Court has carefully considered the record, the comprehensive briefs filed by each side, and the applicable law and concludes that the injunction should be granted but with modification.

### A. Factual Basis

In May 1983 David Morgan and Southern Theaters, Inc., formed a partnership to operate two theaters in Baytown, Texas, one being the Bay Plaza Twin. Southern Theaters has well in excess of $500,000 annually in gross revenues, and it is anticipated that

---

1. " * * * (b) it shall be an unfair labor practice for a labor organization or its agents—

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees: (A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act, (B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or (C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services. Nothing in the paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b). * * * "
29 U.S.C. § 158(b)(7) (1973).

the partnership in the next twelve months will receive at least that amount. The theater rents films which are produced out of the state.

Morgan learned that the Union desired to place its members in his employ, and he understood that Bay Town was a union area. Before opening the Bay Plaza Twin Morgan contacted Raymond Brock, the business agent for the Union, to discuss a union contract. Brock demanded a full union contract which was unsatisfactory to Morgan, and after several sessions of negotiations Morgan declined to use union projectionists for the Bay Plaza Twin but elected, instead, to perform the work himself. Brock told Morgan that if he did not sign the full contract Morgan would be picketed. Brock indicated further that he believed Morgan would not succeed without the Union, that no one ever had. Moreover, Brock suggested that violence usually accompanied picketing. Thereupon, on May 20, 1983, the Union began to picket the theater with signs stating, "This theater does not have a contract with Movie Operators Local 279 a/w AFL–CIO." After three weeks of picketing the Union president assured Morgan that if he would sign a contract, the picketing would cease. Morgan refused.

During the picketing, one picketer on at least seven occasions wore a T-shirt displaying the words "On Strike". On at least one other occasion, the same T-shirt was displayed on the windshield of a car parked in front of the theater with a baseball bat leaned against the car bumper. Additionally, there were leaflets describing a "scab" found in the lobby of the theater, and the theater employees have been called "scabs" by the picketers.

When a representative of the telephone company came to service the telephones in the theater, Brock, the business agent, used threatening words to convey to the telephone serviceman the message that his union would be informed that he crossed the picket line. The picketers at various times have invited the other employees of the theater to join the picket line, but none has accepted the invitation.

Finally, Brock informed Morgan that a certain company which was to deliver video games to the theater would not deliver the games as long as the picketing was carried on.

At present, Morgan continues to operate the movie projection machine, and the theater is operational in all respects. The picketers have stationed themselves near the public entrance and continue to carry the picket sign. There have been no incidents of violence, no stoppage of work, and the "On Strike" T-shirt and baseball bat have not reappeared since July.

## B. Legal Analysis

### 1. Jurisdiction

This Court has jurisdiction under 29 U.S.C. § 160(*l*) (1973), and the interstate character found in film rentals and the anticipated volume of the theater business at the Bay Plaza Twin present the necessary jurisdictional features.

### 2. Reasonable Cause

In proceedings under Section 10(*l*) of the Act, 29 U.S.C. § 160(*l*), the District Court is not called upon to decide whether, in fact, a violation has occurred. The determination of this question is reserved exclusively for the Board. The inquiry of the District Court is limited to a determination of whether the Board had reasonable cause to believe the Act was being violated as charged, and if it so concludes, the District Court must grant such relief as it deems just and proper. *Boire v. Internat'l Brotherhood of Teamsters,* 479 F.2d 778 (5th Cir. 1973).

The statutory standard of "reasonable cause" is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(*l*) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is substantial conflict in the evidence. *Wilson v. Milk Drivers & Dairy Employees Local 471,* 491 F.2d 200, 203 (8th Cir.1974).

### 3. Number of Employees

■ Since Southern Theaters employs no projectionists, the Union contends that the instant situation is governed by *Teamsters Local Union No. 115 (Vila-Barr)*, 157 N.L.R.B. 588 (1966) which held that Section 8(b)(7)(C) did not apply to a stable one-man unit. However, *Vila-Barr* distinguished its facts from those found in *Local 542, Internat'l Union of Operating Engineers, AFL–CIO (R.S. Noonan, Inc.)*, 142 N.L.R.B. 1132, enf'd, 331 F.2d 99 (3d Cir.), *cert. denied*, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964), which is relied upon by the Board. The Court views the present factual setting more like *Noonan* than *Vila-Barr* since, like *Noonan*, there are no projection employees at the Bay Plaza Twin. This Court agrees with the interpretation applied by the Third Circuit:

> [I]f there were no current employees and only a possibility of prospective employees, the Union's recognitional picketing would be unaffected by any requirement of filing a petition with the Board. ... It then could picket, presumably, ad infinitum. Such a construction would be an unreasonable interpretation of the Act.

331 F.2d at 107. Indeed, there is a line of cases which holds that Section 8(b)(7)(C) is a prelude to an election, and where a union is disqualified and cannot become the certified bargaining representative, it cannot employ the picketing procedures at all. *General Serv. Emp. U. Local No. 73 v. N.L.R.B.*, 578 F.2d 361 (D.C.Cir.1978); *Drivers, Chauffeurs, Warehousemen and Helpers Local No. 71 v. N.L.R.B.*, 553 F.2d 1368 (D.C.Cir. 1977).

Accordingly, the Court finds the Union's argument under *Vila-Barr* as unpersuasive.

### 4. Purpose of Picketing

■ The parties agree that informational picketing is excepted from 8(b)(7)(C) in what is known as the "second proviso". The Union may have as its long-range objective recognition as the collective bargaining agent but with the immediate purpose of informing the public that the employer does not employ members of, or have a contract with, the Union. *Hotel and Restaurant Employees Local 681 (Crown Cafeteria)*, 135 N.L.R.B. 1183 (1962), *order sustained sub nom., Smitley v. N.L.R.B.*, 327 F.2d 351 (9th Cir.1964). However, the informational or publicity picketing is allowed only so long as it communicates no more than the limited information permitted or does not in fact have any effect on deliveries or disrupt the business. *N.L.R.B. v. Local 3, Internat'l Brotherhood of Electrical Workers, AFL–CIO, (Jack Picoult)*, 144 N.L.R.B. 5, *aff'd*, 317 F.2d 193 (2d Cir.1963). It has been held that the disruption of business must be substantial. *Hirsch v. Building and Constr. Trades Council*, 530 F.2d 298, 304 (3d Cir.1976).

■ The publicity proviso only exempts from the proscriptions of 8(b)(7)(C) "a comparatively innocuous species of picketing, having the immediate purpose of informing or advising the public" of an employer's non-union policies. *Jack Picoult, supra*, 317 F.2d 193, 197. It affords no protection whatsoever to picketing that is designed to appeal to other organized labor groups to exert economic pressure on an employer, regardless of the actual impact of that appeal. Such is commonly termed "signal" picketing. *Hirsch, supra*, 530 F.2d at 304.

> Under the second proviso it is the difference in purpose which determines which is permissible picketing and which is not. ... [P]ublicity picketing is proscribed when it communicates more than the limited information expressly permitted by the second proviso or when it is apparently the purpose to advise organized labor groups or their members as shown by signal effects.

*Jack Picoult*, 317 F.2d at 199. The Second Circuit Court of Appeals engaged in a rather extensive discussion in order to distinguish publicity picketing from improper signal picketing. It explained that even though the effect might fall short of inducing work stoppage, there may nevertheless be evidence of the non-permissive signaling purpose. One example given was the dis-

play of qualifying signs accompanied by hostile gestures.

It has been said that teamsters and other organized labor groups will not respect publicity lines, whereas they will respect strike lines. *Crown Cafeteria,* 147 N.L.R.B. 1060, 1068 (1964). And where the evidence raises a question as to whether the purpose was merely informational or for signaling, the answer is to be resolved by the Board. *Hirsch, supra,* 530 F.2d at 304.

In the instant dispute, the purpose of the picketing is called into question. The picketers have stationed themselves outside the only entrance to the theater, and not only the public but other union employees have to pass by the signs. When a union telephone man went inside to perform his assigned work, he was threatened for crossing the picket line. Directly in front of the theater at one time, a picketer displayed a T-shirt with the words "On Strike" which message was reinforced by the presence of a baseball bat, i.e., the display of a qualifying sign accompanied by a hostile gesture. The employees of the theater were called "scabs", a common term used for strikebreakers. And, finally, the business manager had evidently communicated with a supplier to the theater, with the result that such supplier would not deliver his equipment so long as the picket continued.

In these circumstances it is apparent that the picketing is not directed at achieving the limited purpose of communicating with the public. The evidence raises a substantial question of whether it is also intended as a signal to organized labor, and the applicability of the publicity proviso is one which only the Board can resolve.

### C. Conclusion

This Court concludes that there is reasonable cause to believe Section 8(b)(7)(C) has been violated, reasonable cause shown in the factual issue of whether the purpose of picketing is informational only or for a signal to other labor groups.

Further, the Court concludes that the granting of the injunction is just and proper because the economic hardship to be suffered by a business in its embryonic stage will be more damaging and long-lasting than a temporary halt to what appears to be impermissible signal picketing. Although freedom of speech is undeniably paramount, this is not synonymous with signaling to obtain organized economic pressure to coerce the employer to accept a union contract.

This Court finds guidance in the recent Ninth Circuit case, *Miller v. United Food & Commercial Workers Union,* 708 F.2d 467 (9th Cir.1983).[2] There the picket not only informed the public of the employer's non-union policies but also caused interruptions of deliveries to the store. The Circuit Court held that a district court has jurisdiction to order a hiatus in all picketing when presumptively legitimate picketing would perpetuate the effects of prior illegal activity.

There has been a great amount of publicity concerning the instant confrontation, *see* Petitioner's Exhibits 5, 6, 7, 13 and 14, and the Court views the approach taken by the *Miller* Court as appropriate to disassociate the unlawful picketing from the lawful. Contrasted to *Miller,* however, the ongoing picketing in the instant case has received a large amount of newspaper coverage in a relatively small town, and it will require more than thirty days, in this Court's estimation, to accomplish the disassociation in the minds of the public. A hiatus of ninety days seems more appropriate to allow the new business an opportunity to become established, and thereafter it will stand or fall without the lingering effects of unlawful picketing. To divorce any suggestion of threats or violence from the pure dissemination of truthful information to the public, the Court hereby orders:

(1) All picketing of the Bay Plaza Twin shall be suspended for a period of ninety (90) days.

---

**2.** The Ninth Circuit relied on *Potter v. Houston Gulf Coast Bldg. Trades Council,* 482 F.2d 837, 841 (5th Cir.1973).

(2) At the resumption of picketing, if any, there shall be no misrepresentation and no information conveyed beyond that allowed by the second proviso to Section 8(b)(7)(C).

(3) Further, there shall be no threats or suggestions of violence in any manner.

(4) Finally, according to the statute there shall be no message or conduct to induce any person not to pick up, deliver or transport any goods or not to perform any services.